UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
MIAMI DIVISION

Case No: 1:14-cv-21285-JJO

VANESSA MILITANO,

      Plaintiff,

vs.

RANDSTAD PROFESSIONALS US, LP,

      Defendant.

_____/

### DEFENDANT, RANDSTAD PROFESSIONALS US, LP 'S, MOTION FOR SUMMARY JUDGMENT AND INCORPORATED MEMORANDUM OF LAW

Defendant, Randstad Professionals US, LP ("Randstad"), by and through its undersigned counsel, pursuant to Federal Rule of Civil Procedure 56(a) and Southern District of Florida Local Rule 56.1, hereby moves this Court to enter final summary judgment in its favor as to each of the remaining[1] Counts I-IV and VI of the Plaintiff, Vanessa Militano's ("Ms. Militano" or "Plaintiff") Amended Complaint, and in support thereof states as follows:

I.    **INTRODUCTION**

Ms. Militano filed her Amended Complaint on April 8, 2014, alleging that Randstad, her former employer, discriminated against her because of her disability or handicap in violation of the Americans with Disabilities Act of 1990 (the "ADA") and the Florida Civil Rights Act (the "FCRA"). Ms. Militano also alleges that Randstad's termination of her employment was retaliatory under the ADA and FCRA. She further alleges that Randstad invaded her privacy by purportedly misappropriating her image and likeness for commercial gain in violation of § 540.08 of the Florida Statutes.

The undisputed material facts (the "Summary Judgment Evidence") [ECF No. 48] show conclusively that summary judgment should be granted in favor of Randstad as a matter of law.

---

[1] Plaintiff's Amended Complaint originally included a count for "Unpaid Wages" under § 448.08 of the Florida Statutes. This claim, Count V of the Amended Complaint, was dismissed *with prejudice* pursuant to a stipulation of the parties and an order entered by this Court on December 19, 2014. *See* Order of Dismissal [ECF No. 26].

Ms. Militano lacks any evidentiary support for her disability and handicap discrimination claims (whether for disparate treatment or retaliation), as she cannot demonstrate that she was treated differently because of her alleged disability prior to her complaint to Human Resources, nor that she was retaliated against after having complained to Human Resources.  Moreover, any actions taken against her were for legitimate business reasons.  Further, Ms. Militano cannot substantiate her claim that any person at Randstad was using her image or likeness.  For these reasons, summary judgment should be awarded in favor of Randstad and against Ms. Militano on all five (5) remaining counts of her Amended Complaint.

## III.    SUMMARY JUDGMENT STANDARD

"Summary judgment is proper 'if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.'"  *J.P.M. v. Palm Beach Cnty. Sch. Bd.*, 916 F. Supp. 2d 1314, 1319 (S.D. Fla. 2013) (citations omitted).  "The party asking for summary judgment always bears the initial responsibility of informing the court of the basis for its motion and identifying those portions of the pleadings or filings which it believes demonstrate the absence of a genuine issue of material fact.  *Id.* at 1320 (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  Moreover, "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  Thus, "[a] mere 'scintilla' of evidence supporting the opposing party's position will not suffice; there must be enough of a showing that the jury could reasonably find for that party." *Brooks v. Cnty. Comm'n of Jefferson Cnty., Ala.*, 446 F.3d 1160, 1162 (11th Cir. 2006).

Because the Summary Judgment Evidence here establishes that no genuine dispute as to any material fact exists, final summary judgment should be awarded in favor of Randstad as to each of Plaintiff's remaining five (5) claims.

## IV.    ARGUMENT

### A. <u>Ms. Militano Cannot Prove That She Was Discriminated Against Because of Any Disability Prior to Her Complaint to Human Resources</u>.

In Counts I and II of the Amended Complaint, Ms. Militano alleges that Randstad discriminated against her on the basis of an alleged mental disability (for which she later complained to Human Resources).  (Compl., ¶¶ 43-55).  To succeed on her claims of disability

discrimination under the ADA and the FCRA,[2] Ms. Militano must establish the following: (i) she is disabled; (ii) she is a qualified individual; and (iii) she was subjected to unlawful discrimination because of her disability. *Richio v. Miami-Dade Cnty.*, 163 F. Supp. 2d 1352, 1360 (S.D. Fla. 2001) (citations omitted). Here, Ms. Militano cannot demonstrate that she ever was treated disparately by her coworkers or by anyone in management, let alone because of her purported disabilities. Indeed, as set forth in detail below, Ms. Militano was unable at her deposition to identify any factual basis for her claim that she was discriminated against because of any alleged disability.

### 1.    Ms. Militano Cannot Show Any Discrimination by Her Coworkers.

Ms. Militano identified at deposition all disparate treatment that she alleges occurred at the hands of her co-workers. She alleges that: (i) on one occasion in 2012, Dan Fingerhut, ("Mr. Fingerhut"), a fellow Executive Recruiter, got into a verbal altercation with her and called her a "cunt" and told her that her "days were numbered at Mergis"; (ii) on one occasion in 2012, Elizabeth Ramos, ("Ms. Ramos"), a fellow Recruiter, got into a verbal altercation with her and called her a "bitch" and told her that her "days were numbered at Mergis[3]; (iii) that she was not invited to lunches or after work events with co-workers; and (iv) that coworkers would create false job postings or would not present her candidates. (Statement of Undisputed Facts ¶¶ 4, 6-7). That is the sum total of the allegations of unfair treatment by her co-workers, and Ms. Militano confirmed that there were no more incidents similar to the arguments with Ms. Ramos and Mr. Fingerhut after 2012.[4] (*Id.* at ¶¶ 4, 6).

---

[2] Claims for handicap discrimination and retaliation under the FCRA are analyzed under the same framework as claims under the Americans with Disabilities Act ("ADA"). *See Dulaney v. Miami-Dade County*, 481 Fed. Appx. 486 (11th Cir. 2012); *Byrd v. BT Foods, Inc.*, 948 So. 2d 921, 925 (Fla. 4th DCA 2007).

[3] The Mergis Group's ultimate parent company was purchased by Randstad's ultimate United States parent company, and following the acquisition, became part of Randstad.

[4] Ms. Militano filed her Charge of Discrimination on December 13, 2013, alleging discrimination and retaliation on the basis of an alleged mental disability. (Statement of Undisputed Facts ¶ 29). To the extent that Ms. Militano wishes to base any of her claims on gender discrimination or discrimination based upon the acts occurring in 2012, her claims are time-barred. Because there was no continuing action by these coworkers—and none has been alleged in the Amended Complaint—claims based upon purported disparate treatment in 2012 are now time-barred, as they occurred well outside the 300-day time period outlined by the Equal Employment Opportunity Commission (or, 365 days for a charge before the Florida Commission on Human Relations) in which Ms. Militano would have been permitted to file a charge of discrimination based upon such acts. *See* 42 U.S.C. § 2000e-5(e)(1) (2012). *See Geer v. Marco Warehousing, Inc.*, 179 F. Supp. 2d 1332, 1339 (M.D. Ala. 2001) ("The continuing violation doctrine does not exist to provide a 'second chance' to an employee who allowed a[n] [ostensibly] legitimate claim to lapse." (citing *Carter v. West Publ'g Co.*, 225 F.3d 1258, 1264 (11th Cir. 2000) (internal citations omitted)). "Likewise [the continuing violation doctrine] does not permit the employee to buttress a weak claim of [discrimination] by

When pressed several times to identify why she believed her coworkers treated her adversely, Ms. Militano responded merely, "I don't know." (*See* Statement of Undisputed Facts ¶ 7). Ms. Militano additionally testified that she was unable to identify the reasons that she believes her coworkers allegedly would create false job postings or allegedly would not present her candidates. (*See id.*) Notably, she confided at the time to her boyfriend, Jorge Morales, that she believed that her coworkers treated her negatively because of perceived jealousy that she was a top performer in the office. (*Id.*) And, despite Ms. Militano's allegations concerning the occasional use of inappropriate language during these disputes with her peers, Ms. Militano could point to no instance where such arguments involved or were because of her alleged disability. (*Id.*) Indeed, when testifying that Mr. Fingerhut and Ms. Ramos mentioned to Ms. Militano that her "days were numbered at Mergis," (which she alleges occurred prior to Randstad's acquisition of Mergis), Ms. Militano could point to nothing other than her subjective assumption and perception that either Mr. Fingerhut or Ms. Ramos had any influence over Mr. Leeds' personnel decisions. (*Id.*) She further acknowledged that neither Mr. Fingerhut nor Ms. Ramos had any authority to affect personnel decisions at Randstad, thus leaving her unable to muster anything other than that the comments "sound[ed] like a threat to [her]." (*Id.*) Indeed, Ms. Militano additionally testified that she deemed the 2012 sales dispute with Ms. Ramos and Mr. Fingerhut to be resolved directly after the disputes. (Statement of Undisputed Facts ¶ 5). Of note, her employment continued, unaltered after these events, which are now time-barred.[5]

---

referencing untimely facts that bear the most tenuous of relations to timely facts." *Geer*, 179 F. Supp. 2d at 1339. (citing *Lawton v. State Mut. Life Assurance Co. of Am.*, 101 F.3d 218, 221 (1st Cir. 1996) ("Common sense teaches that a plaintiff cannot resuscitate time-barred acts, said to be discriminatory, by the simple expedient of linking them to a non-identical, non-discriminatory, non-time-barred act.")).

[5] The comments that Ms. Militano attributes to Ms. Ramos and Mr. Fingerhut are more closely related to Ms. Militano's **gender**, female, and are in no way indicative of any other form of discrimination. *Cf. Galloway v. Gen. Motors Serv. Parts Operations*, 78 F.3d 1164, 1167-68 (7th Cir. 1996) ("Obviously if Bullock had merely called Galloway a 'loonie' or 'nut case' or 'whacko' this would not be abuse actionable under Title VII, because it would have nothing to do with Galloway's being a woman or belonging to a different gender from her tormentor. It would not be sex discrimination."), *abrogated on other grounds by Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 122 S. Ct. 2061, 153 L. Ed. 2d 106 (2002). Applying the rationale of *Galloway*, which has been cited approvingly within the Eleventh Circuit, *see Mendoza v. Borden, Inc.*, 195 F.3d 1238, 1247 (11th Cir. 1999), that Ms. Militano may have been referred to as a "bitch" or a "whore" is not indicative of **disability** discrimination. As noted previously, however, any claim based upon purported gender discrimination is time-barred.

Moreover, Ms. Militano explained that <u>she did not know that she had a disability at the end of 2012</u>,[6] which was well after the time of these two confrontations with her coworkers, Mr. Fingerhut and Ms. Ramos.   (Statement of Undisputed Facts ¶ 8).   Thus, Ms. Militano has provided **no** connection between her alleged disability and the purportedly disparate treatment that she declares that she suffered at the hands of her colleagues during her employment at Randstad because such a connection is a chronological impossibility.

On these facts, Plaintiff cannot show any evidence that the treatment of her by her co-workers was discriminatory based on her alleged disability.   *See Fodor v. Eastern Shipbuilding Grp.*, No. 5:12-CV-28-RS-CJK, 2014 WL 1478845, at *14 (N.D. Fla. Apr. 15, 2014) (granting summary judgment to employer where plaintiff was able to proffer nothing more in support of his discrimination claim than workplace teasing and pranks based solely upon the "hate against [him]" and that his coworkers "do all kinds of hateful things against [him]").   The absence of any protected characteristic that can be linked to any alleged unfair treatment is fatal to her claims of disability discrimination under the ADA and FCRA.   *See Richio*, 163 F. Supp. 2d at 1364 (noting that an employer discriminates when it acts or fails to act regarding a ***known*** disability); *Lewis v. Zilog, Inc.*, 908 F. Supp. 931, 948 (N.D. Ga. 1995) (". . . before an employer can discriminate against an employee because of that employee's disability, the employer must be aware of that disability.").   Certainly, Randstad cannot be charged with knowledge of her disability when the Plaintiff has testified that even she was unaware of an alleged disability.   As such, any claims arising out of the 2012 incidents fail as a matter of law.

2.      **Mr. Leeds Alleged Comments Are Neither Direct Nor Circumstantial Evidence of Disability Discrimination.**

The Summary Judgment Evidence reveals plainly that Mr. Leeds never discriminated against Ms. Militano.   Ms. Militano's claims of disability discrimination by any supervisor rest solely upon her accusation that <u>on only one occasion</u>,[7] during their meeting on October 10, 2013,

---

[6] While Ms. Militano's medical records show that she had begun seeing a psychiatrist in early 2012, she had not, at the time of the 2012 arguments with coworkers, been diagnosed with any mental disorder other than Attention Deficit Disorder, and, in any event, she testified that she did not know that she had any other disorder and stated unequivocally that she was unaware of the reasons for the alleged  negative treatment.   (Statement of Undisputed Facts ¶¶ 7-8).

[7] While, Ms. Militano's has denied repeatedly that she is making a claim for disability harassment, *see* (Pl.'s Resp. to Interrog. No. 16, *see* **Exh. "M"** to Def.'s Mot. for Summ. J.), to the extent that she is alleging same, her sole purported evidence of discrimination by Mr. Leeds is an insensitive comment allegedly made on <u>one occasion</u>, and thus, hardly could satisfy the severity and pervasiveness requirement to state a claim for harassment.   Even taking

Mr. Leeds told her that she needed to contact her doctor to get stronger medication and that her mental state had improved since 2012 following a "binge" on mental health drugs. (Statement of Undisputed Facts ¶ 14). This alleged altercation occurred after Ms. Militano sent to both Mr. Leeds and Ms. Bostrom a text message that she was running late to the office because she had been in a fight with her boyfriend that morning, and her boyfriend would not allow her to leave the house and held her against her will. (*Id.* at ¶ 12). Ms. Militano finally arrived to the office at approximately 11:30 that morning, and, as had occurred previously, she missed an interview that she had scheduled with two (2) candidates that morning, which Ms. Bostrom covered that day. (*Id.*) Although the two were supposed to have a meeting, Mr. Leeds noticed that Ms. Militano appeared as though she had been crying, and he decided to hold off on the meeting until a little later that day. (Statement of Undisputed Facts ¶ 13). At approximately 2:30 that afternoon, the two met in Mr. Leeds' office, which was located adjacent to the area where all of the recruiters worked alongside each other. (*Id.*) Ms. Militano discussed her desire to become a Practice Director, at which time Mr. Leeds explained to her that there was no such position open in the Miami office at that time. (*Id.*) Ms. Militano began to cry and stormed out of his office to grab her belongings to leave the office, despite having been at work for less than four (4) hours that day. (*Id.*) Following Ms. Militano's abrupt exit, Mr. Leeds attempted to contact her, but she refused to respond, and she failed to contact or to communicate with Mr. Leeds for the rest of that day, despite Mr. Leeds' attempts to make contact. (*Id.* at ¶ 14).

Here, it appears that Ms. Militano "seek[s] to avoid summary judgment by relying on what [she] claim[s] to be direct evidence of discrimination. 'Direct evidence of discrimination would be evidence which, if believed, would prove the existence of a fact [in issue] ***without inference or presumption***.'" *Earley v. Champion Int'l Corp.*, 907 F.2d 1077, 1081 (11th Cir. 1990) (citations omitted) (emphasis in original). "'[O]nly the most blatant remarks, ***whose intent could be nothing other than to discriminate on the basis of [disability]***, . . . constitute direct

---

what Ms. Militano said as true—that she was mocked and felt embarrassed by Mr. Leeds' alleged comments—even if made, the comments, "while unfortunate, [were] neither physically threatening to [Ms. Militano] nor did it occur more than once." *See Meszes*, 2007 WL 4218947, at *3. It is clear that "simple teasing . . . offhand comments, and ***isolated incidents*** (unless extremely serious) will not amount to discriminatory changes in the 'terms and conditions of employment.'" *Id.* (citing *Faragher  v. City of Boca Raton*, 524 U.S. 775, 788 (1998)). Comments much more invidious than those that Ms. Militano alleges have been found insufficiently severe or pervasive enough to warrant the imposition of liability for disability harassment. *Id.* Accordingly, the conduct alleged here is "not of the quality or frequency that would adequately support a theory of [disability harassment]." *Meszes*, 2007 WL 4218947, at *3 (citations omitted).

AKERMAN LLP, 777 SOUTH FLAGLER DRIVE, SUITE 1100 WEST TOWER, WEST PALM BEACH, FL  33401

evidence of discrimination.'"  *Id.* (quoting *Carter v. City of Miami,* 870 F.2d 578, 582 (11th Cir. 1989)).  Even if Mr. Leeds had made these statements, which is denied, as a matter of law, such comments, which stand in isolation, constitute neither direct nor circumstantial evidence of disability discrimination.

Absent more, Ms. Militano's allegations of what Mr. Leeds allegedly stated to her on October 10, 2013, cannot constitute direct evidence of discrimination, as such remarks are not of the "blatant" variety to evidence a clear intent to discriminate.  *See Earley*, 907 F.2d at 1081. Moreover, the record evidence reveals plainly that Ms. Militano was never discriminated against based upon some unknown condition.  In fact, Ms. Militano testified that she had been accommodated on numerous occasions throughout her employment.  *See* (Statement of Undisputed Facts ¶ 9).  Although no formal request was made for accommodation for her purported disability, Ms. Militano admitted unequivocally that Mr. Leeds accommodated her each and every time that she made a request to be out of the office; to come in late;[8] to visit a doctor; to recover from a rift with her boyfriend, or even to leave early from the office to take a personal trip to the Keys with her boyfriend.  (*Id.*)  Similarly, Ms. Militano testified that she was invited to President's Club in March 2013 for having achieved best "Year Over Year" performance, and she was asked to speak at Boot Camp for new recruiters for two years in a row, which she considered an honor.  Additionally, she testified that when she requested time off, such time off always was granted to her, and Ms. Militano was then able to resume her normal duties at Randstad when she returned.  (*Id.*)  Further, the documentary evidence is replete with texts and/or emails demonstrating Mr. Leeds' unqualified acquiescence to such requests without consequence over the course of more than a year.  Moreover, Ms. Militano alleges no other purportedly discriminatory conduct by Mr. Leeds prior to the conversation on October 10, 2013. (*Id.* at ¶ 14).  Accordingly, the two comments that Ms. Militano alleges that Mr. Leeds ever made to her regarding her alleged disability (which are alleged to have occurred on the day before she complained to Human Resources) are insufficient to provide any direct evidence of discrimination.  *See Minhngoc P. Tran v. Boeing Co.*, 190 Fed. Appx. 929, 932 (11th Cir. 2006) (finding that the plaintiff could not pursue a discrimination claim based upon direct evidence

---

[8]  In fact, because of her tardiness (on several occasions), she missed meetings with candidates that she had scheduled in the office. *See* (Statement of Undisputed Facts ¶ 9).

where the alleged comments were unrelated to termination or any other adverse personnel action).

Further, Ms. Militano claims that she was denied a Practice Director Position because of her mental disability.  *See* (Compl., ¶¶ 23-26).  This claim, too, falls on its face.  To the extent that Ms. Militano alleges that the purported denial of the Practice Director position is evidence of discrimination,[9] there was no open Practice Director position in the Miami office at the time that Ms. Militano inquired regarding the position.  (Statement of Undisputed Facts ¶ 13).  Thus, the failure to place Ms. Militano in such a position hardly can be characterized as an adverse action.  *See, e.g.*, *Lucas v. W.W. Grainger, Inc.*, 257 F.3d 1249, 1257-58 (11th Cir. 2001) (noting that an employer does not discriminate when it does not promote a disabled employee where no such position exists or the employee is not otherwise qualified for that position).  Even if Mr. Leeds commented on Ms. Militano's alleged mental health condition, the record demonstrates that such comments, ***even assuming their truth***, were not used for the purpose of denying to her any benefits, compensation, or promotion.  *See Minhngoc P. Tran*, 190 Fed. Appx. at 932 (explaining that direct evidence does not exist if the alleged discriminatory conduct is not connected to a personnel action such as termination).  Rather, she was told there was no such position available before any discriminatory statement allegedly was made to her as she stormed out of the office in response.  The Summary Judgment Evidence fails to support Ms. Militano's claim for disability discrimination, whether based on direct or circumstantial evidence.  *See Siudock v. Volusia Cnty. Sch. Bd.*, No. 6:12-CV-503-ORL-28, 2013 WL 6187537, at *10 (M.D. Fla. Nov. 25, 2013) (granting employer's motion for summary judgment as to ADA claim even where the plaintiff on one occasion had been referred to by a supervisor as "crazy"), *aff'd*, 568 Fed. Appx. 659 (11th Cir. 2014).

Similarly, Ms. Militano cannot point to any evidence that  Randstad "regarded" her as disabled.  Even with respect to Ms. Militano's claims that Randstad "perceived" or "regarded" her as disabled, she can point to no evidence of such a perception or any adverse employment action that was taken on the basis of such a perception.  *See* 29 C.F.R. § 1630.2(j)(3)(i).  To succeed on a claim of perceived disability, Ms. Militano would have to establish that she: (i) has an impairment that does not substantially limit a major life activity, but is treated by an employer

---

[9] If Ms. Militano uses circumstantial evidence to establish her claims of disability discrimination, " . . . the burden-shifting framework established in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973), applies" to the analysis of her claims.  *Alansari v. Tropic Star Seafood Inc.*, 388 Fed. Appx. 902, 904 n.3 (11th Cir. 2010).

AKERMAN LLP, 777 SOUTH FLAGLER DRIVE, SUITE 1100 WEST TOWER, WEST PALM BEACH, FL  33401

as though it does; (ii) has an impairment that limits a major life activity only because of others' attitudes towards the impairment; *or* that she (iii) has no impairment whatsoever, but is treated by an employer as having a disability as recognized by the ADA. *Gilliard v. Ga. Dept. of Corrections*, 500 Fed. Appx. 860, 867 (11th Cir. 2012) (quoting *Standard v. A.B.E.L. Servs., Inc.*, 161 F.3d 1318, 1327 n.2 (11th Cir. 1998)).

The record evidence fails to support Ms. Militano's accusation that Randstad's management viewed her as disabled. In fact, as noted above, Ms. Militano received the fullest extent of every privilege and benefit of her employment with Randstad prior to her termination resulting from her own insubordinate behavior. Viewing the claims in the light most favorable to the Ms. Militano, at best if credited, Mr. Leeds made a single off-hand, colloquial comment to her about her needing to get stronger medication, for which she immediately complained to Human Resources. (Statement of Undisputed Facts ¶ 14-15). ***At no other time does she state that Mr. Leeds made any other comments regarding her alleged condition.*** In direct contradiction to an allegation of discrimination, Plaintiff has conceded that she would be permitted to take time off without question on the limited occasions that she actually mentioned that she needed to see a doctor. *See* (Statement of Undisputed Facts ¶ 9). A singular off-hand comment in the face of unprofessional, irrational and insubordinate behavior by the Plaintiff hardly can support a claim for disability discrimination, as Ms. Militano certainly cannot demonstrate that the purported "denial" of a Practice Director position (which was not available and is not available to this day) was a direct result of her perceived disability, and she suffered no other tangible employment action that can be causally connected to this incident. *See Chockla v. Celebrity Cruise Lines, Inc.*, 47 F. Supp. 2d 1365, 1370 (S.D. Fla. 1999) (granting summary judgment to employer where plaintiff failed to establish that that any adverse employment action was the result of her disability—her HIV positive status).

Upon review of the Summary Judgment Evidence, this Court properly may conclude that "[Ms. Militano's] claim is based on [her] subjective perception and speculation rather than on specific facts from which a reasonable jury could find that [she] was subjected to [discrimination] because of [her alleged disability]." *Brown v. Progress Energy*, 364 Fed. Appx. 556, 558 (11th Cir. 2010). Accordingly, the claims in Counts I and II of the Amended Complaint fail as a matter of law, and Defendant is entitled to final summary judgment as to these claims.

AKERMAN LLP, 777 SOUTH FLAGLER DRIVE, SUITE 1100 WEST TOWER, WEST PALM BEACH, FL 33401

**B.** **The Summary Judgment Evidence Demonstrates that Randstad Did Not Retaliate Against Ms. Militano *Because of* Any Complaint of Disability Discrimination.**

Ms. Militano alleges that the termination of her employment was in retaliation for her complaint to Human Resources regarding alleged disability discrimination. (Compl., ¶¶ 56-65). The ADA contains a provision prohibiting retaliation, 42 U.S.C. § 12203(a) (2012), and, as noted above, the FCRA borrows from the analysis used in evaluating such claims. The Eleventh Circuit has stated that it assesses retaliation claims under the ADA (and thus under the FCRA) using the same framework as Title VII. *Burgos-Stefanelli v. Sec'y, U.S. Dept. of Homeland Sec.*, 410 Fed. Appx. 243, 245 (11th Cir. 2011). To succeed on an ADA retaliation claim, a plaintiff must establish that: (1) she engaged in statutorily protected expression; (2) she suffered a materially adverse employment action; and (3) there was a causal relationship between the two events. *Id.* at 246. Concerning the element of causation, Ms. Militano must establish that the alleged protected expression in which she engaged was the ***but-for*** cause of the adverse action. *Edwards v. Gwinnet Cnty. Sch. Dist.*, 977 F. Supp. 2d 1322, 1330 (N.D. Ga. 2013) (citing *Univ. of Texas Sw. Med. Ctr. v. Nassar*, 133 S.Ct. 2517, 2533 (2013)). "[If] a plaintiff has established a *prima facie* case, the employer [in accordance with the *McDonnell-Douglas* framework] then has an opportunity to articulate a legitimate, non-retaliatory reason for the challenged employment action." *Id.*; *Fodor*, 2014 WL 1478845, at *17.

After making her complaint to Human Resources, Ms. Militano was permitted by Ms. Freitas to work remotely during the course of the investigation into her claims. (Statement of Undisputed Facts, ¶ 19). In the interim, Mr. Leeds, who was unaware of Ms. Militano's complaint to Human Resources on the morning of October 11, 2013, began to contact Ms. Militano to inquire as to the reason that she was not in the office well after her designated start time of 10:00 a.m. (*Id.* at ¶ 16). After several attempts to contact Ms. Militano, she failed to respond to explain the reasons that she was not in the office. *Id.* Moreover, Ms. Militano had asked Maria Alfonso, the Miami Office Manager, to assist with removing some belongings from the office. (*Id.*)

On October 14, 2013, Ms. Freitas interviewed other employees in the office. (*Id.* at ¶ 17). In the meantime, seeking to garner support for her complaint and to engineer a false impression of what occurred in the office, Ms. Militano contacted Ms. Bostrom, where she attempted to coach her regarding how to respond to Ms. Freitas' inquiries and to solicit Ms. Bostrom to

request that another employee likewise follow her instructions to make a false statement to Ms. Freitas that everyone in the office was "mean" to Ms. Militano.  (*Id.*)  During the investigation, Ms. Freitas discovered that many of the employees in the office had a number of complaints about Ms. Militano's disruptive behavior, particularly her boisterous accusations that fellow recruiters were "stealing" her candidates and/or were refusing to submit candidates that she suggested to potential employers.  (*Id.* at ¶ 18).   Ms. Freitas was able to conclude that a hostile work environment did not exist in the office, and was unable to conclude that the conversation on October 10, 2013 between the Plaintiff and Mr. Leeds had occurred in the manner that Ms. Militano had alleged. (*Id.*)  Ms. Freitas' interviews with Ms. Militano's fourteen (14) coworkers made clear, however, that the source of dissension within the office often was Ms. Militano. (*Id.*)  Specifically, the investigation revealed a number of confrontations that Ms. Militano had instigated with other recruiters in the office that focused on job placement deals.  (*Id.*)  On or about the evening of October 14, 2013, Ms. Freitas called Ms. Militano to discuss her findings. (*Id.* at ¶ 19).  Ms. Militano, who had been allowed by Ms. Freitas to work remotely during the course of the investigation, was asked to return to work in the Miami office on October 16, 2013. (*Id.*)

Ms. Militano first contends that the issuance of the Guidelines on October 16, 2013, upon her return to the office after Ms. Freitas' investigation had concluded, as well as "imposing" a purportedly "new" arrival time of 10:00 a.m., were retaliatory actions.  Though previously she had not received written Guidelines regarding the time that she was scheduled to be in the office, Ms. Militano's emails and texts betray her position that there was no expectation that she adhere to a schedule of arriving to work at a specified time.  *See* (*id.* at ¶¶ 9, 12).  Specifically, these emails and texts demonstrate that when Ms. Militano was running late to work, she would let Mr. Leeds know.  (*Id.*)   But, after her complaint to Human Resources, she admitted that she continually failed to adhere to the schedule set for her, as she "never came in at 10:00." *See* (*id.* at ¶¶ 21-22).  Plainly, Ms. Militano cannot demonstrate that she was treated any differently than any other employees with the same or similar performance issues that she was demonstrating upon her return to the office. *See* (*id.* at ¶ 21).   Indeed, Plaintiff is hard pressed to show that a continuing requirement to be in work by 10 a.m. is retaliation or that other employees who directly disobeyed clearly set requirements set by Mr. Leeds were treated more favorably.  Ms. Militano admitted that for the entirety of her employment, she was unaware of the specific

schedules that had been approved by Mr. Leeds for other recruiters in the office.  (*Id.*)  Thus, she had no idea about any other recruiter's schedule and could not point to any reason other than her mere speculation that others were treated differently regarding requiring adherence to a schedule. *See Knight v. Baptist Hosp. of Miami*, 330 F.3d 1313, 1316 (11th Cir. 2003) (holding that a proper comparator must be "similarly situated in all relevant respects," including that employees were disciplined differently despite engaging in the ***same*** misconduct).  Ms. Militano can point to no other similarly situated employee that was treated more favorably than she.  In fact, Mr. Leeds testified that <u>Ms. Militano was the only employee in the office who continually failed to adhere to his expectations with regard to attendance</u>, and the Guidelines served as a mere written reminder of preexisting requirements where repeated verbal counseling had failed.  (Statement of Undisputed Facts, ¶ 20).

Moreover, with regard to working remotely, Ms. Militano alleges that the Guidelines informing her that she was not allowed to do so was retaliatory.  However, no adverse employment action occurred as a result of such directive.  *See* (Statement of Undisputed Facts, ¶ 20).  Likewise, the Guidelines required Ms. Militano to split commissions with any other recruiter who covered an interview for her.  (*Id.*)  To the extent that Ms. Militano alleges that splitting commissions was a new requirement, this expectation was no different than the expectation prior to her complaint to Human Resources, and it was a practice that Ms. Militano herself testified had long been recognized under Mr. Leeds' management.  (*Id.* at ¶¶ 3, 20).  Moreover, as a full-time employee, Ms. Militano had, even prior to her complaint to Human Resources, been required to work at least eight (8) hours each work day and forty (40) hours each workweek.  (*Id.* at ¶¶ 1, 20).  Finally, with regard to her time out of the office, Ms. Militano had been granted significant time out of the office, and though no formal paid time off policy applied to Executive Recruiters, she, along with her colleagues, were well aware that consistent attendance in the office was always an expectation.  As such, nothing articulated in the Guidelines that were issued after her complaint to Human Resources altered any of the terms and conditions of Ms. Militano's employment.

"[A]n action is not adverse [for purposes of a retaliation claim] simply because [Ms. Militano] dislikes it or disagrees with it." *Duble*, 572 Fed. Appx. at 895 (quoting *Doe v. Dekalb Cnty.*, 145 F.3d 1441, 1449 (11th Cir. 1998)).  Further, even assuming—in a light most favorable to Ms. Militano—that the Guidelines were an example of a negative performance memorandum,

AKERMAN LLP, 777 SOUTH FLAGLER DRIVE, SUITE 1100 WEST TOWER, WEST PALM BEACH, FL  33401

"[s]tanding alone, negative job performance memoranda . . . 'do not often meet the statutory threshold' for adverse employment action." *Lewis v. Michaels Stores, Inc.*, No. 305-CV-1323J-33MCR, 2007 WL 2254502, at *6 (M.D. Fla. Aug. 3, 2007) (citing *Davis v. Town of Lake Park, Fla.*, 245 F.3d 1232, 1240-41 (11th Cir. 2001)). "[C]ourts are wisely reluctant to treat [as actionable retaliation] job performance memoranda," which may encompass the Guidelines presented to Ms. Militano, where there was no "adverse action such as a loss in benefits, ineligibility for promotional opportunities, or more formal discipline" related to such Guidelines. *Edwards*, 977 F. Supp. 2d at 1333.

Additionally, in the two weeks after Ms. Militano returned to work, the undisputed facts demonstrate that Ms. Militano was extremely disruptive to the working environment in the Miami office. While looking into allegations by Ms. Militano of retaliatory treatment after her return to work, Ms. Freitas discovered additional insubordinate behavior following Ms. Militano's return to the office. (Statement of Undisputed Facts, ¶ 22). On October 16, 2013, her first day back in the office, Ms. Militano arrived at 9:50 a.m., but she left at 4:45 p.m. without informing management and failing to put in the eight (8) hours that she always had been required to work and of which she was reminded in writing. (*Id.* at ¶ 21). Although, Ms. Militano had been asked to resume her previous schedule of arriving at the office by 10:00, but she refused to abide by her manager's directive do so, stating that she "never came in at 10:00." (*Id.* at ¶ 22). Moreover, during a "Hot Jobs" meeting conducted on October 23, 2013, Ms. Militano stated audibly in reference to Mr. Leeds, "[w]ay to fucking manage your client" before walking out of the meeting—without prior permission. (*Id.* at ¶ 24). Ms. Militano had become confrontational with Ms. Freitas and belittled her simply because she expected Ms. Freitas to fly down to interview employees in person, rather than conduct the investigation remotely. (*Id.* at ¶ 15). Similarly, Ms. Militano was observed being disrespectful at the time that she spoke with Rhonda Reid ("Ms. Reid"), Team Lead for Randstad's IT Service Desk, who was attempting to assist Ms. Militano with the changing of her password following her return to the office. (*Id.* at ¶ 23). Ms. Reid found Ms. Militano's conduct so offensive that she complained to Ms. Freitas regarding the substance of the conversation. (*Id.*) As such, while Ms. Freitas could not substantiate any retaliatory action had occurred, there was a plethora of evidence that Ms. Militano had no intention of working productively with others or abiding by her manager's reasonable expectations. Therefore, the decision was made that Ms. Militano's insubordination,

AKERMAN LLP, 777 SOUTH FLAGLER DRIVE, SUITE 1100 WEST TOWER, WEST PALM BEACH, FL 33401

belligerence, and attendance issues following her return warranted her termination from employment. (*Id.* at ¶ 25).

The Summary Judgment Evidence supports that Ms. Militano's acts and omissions – not her complaint to HR – were the cause of her termination. (*Id.* at ¶¶ 21-25). That Ms. Militano complained to Ms. Freitas about alleged negative treatment in the office did not insulate her from either following prescribed work rules or treating her coworkers and managers with respect. *See Alvarado v. Boca Raton Cmty. Hosp.*, No. 09-81598-CIV, 2010 WL 3941826, at *16 (S.D. Fla. Oct. 6, 2010) (granting summary judgment to employer where plaintiff's continued misconduct following her complaint of discrimination was "the intervening act that severed any inference of causation"). Congress certainly did not intend for the ADA's protections against retaliation to countenance such behavior. *See, e.g., id.* (noting that an employer lawfully may effect the termination of employment based upon a legitimate reason such as continued misconduct following a complaint of discriminatory conduct); *Lewis v. Zilog, Inc.*, 908 F. Supp. 931, 948 n.7 (N.D. Ga. 1995) (noting that ". . . several courts have held that an employer may not be subject to liability for correcting employee misconduct, even if the conduct was caused by a qualifying disability or handicap" and granting summary judgment to employer where disabled plaintiff was terminated for misconduct and violation of employer policies). Indeed, Ms. Militano's mere belief that her disability and medical conditions and/or her complaint to Human Resources caused her termination is insufficient to support her claim of retaliation, especially in the face of her own misconduct. *See, e.g., Stanley v. Lockheed Martin Corp.*, No. 6:11-CV-1649-ORL-36, 2013 WL 3974655, at *8 (M.D. Fla. Aug. 1, 2013) *Id.*

Ms. Militano has no material evidence to show that her ultimate termination from employment was ***"because of"*** her complaint to Human Resources. Therefore, her claims cannot withstand summary judgment. *See Young v. City of Palm Bay, Fla.*, 358 F.3d 859, 860 (11th Cir. 2004); *Allen v. Tyson Foods, Inc.*, 121 F.3d 642, 646 (11th Cir. 1997). As such, each of Ms. Militano's retaliation claims under the ADA and FCRA fails, and Randstad is entitled to final summary judgment as to Counts III and IV of the Amended Complaint as a matter of law.

**C. The Summary Judgment Evidence Demonstrates that Randstad Never Misappropriated Ms. Militano's Name or Likeness.**

Ms. Militano alleges in Count VI of her Amended Complaint that following the termination of her employment, Randstad employees used her name, image, and likeness to

AKERMAN LLP, 777 SOUTH FLAGLER DRIVE, SUITE 1100 WEST TOWER, WEST PALM BEACH, FL 33401

secure clients and candidates for commercial gain. (Compl, ¶¶ 69-74). Specifically, she alleges that Mr. Leeds was using both "her" Randstad email account, as well as "her" LinkedIn Recruiter account to contact clients, all while pretending to be her.

> Section 540.08 provides in pertinent part:
>
> No person shall publish, print, display or otherwise publicly use for purposes of trade or for any commercial or advertising purpose the name, portrait, photograph, or other likeness of any natural person without the express written or oral consent to such use given by:
>
> (a) Such person; or
>
> (b) Any other person, firm or corporation authorized in writing by such person to license the commercial use of her or his name or likeness . . . .

§ 540.08(1)(a), (b), Fla. Stat. (2013). However, the Summary Judgment Evidence demonstrates conclusively that Ms. Militano cannot substantiate her claims of commercial misappropriation.

A claim for commercial misappropriation under § 540.08 must contain more than the bald assertion that the plaintiff's name or likeness was included in a communication that ultimately was used for a commercial benefit without the plaintiff's consent; <u>a plaintiff must show that her name or likeness actually was used to promote a particular product or service</u>. *Almeida v. Amazon.com, Inc.*, 456 F.3d 1316, 1325-26 (11th Cir. 2006); *Valentine v. C.B.S., Inc.*, 698 F.2d 430, 433 (11th Cir. 1983); *Fuentes v. Mega Media Holdings, Inc.*, 721 F. Supp. 2d 1255, 1258 (S.D. Fla. 2010) (citations omitted). The damaging part of commercial misappropriation lies in the direct association of an individual's name or personality with something other than what that individual intended. *Tyne v. Time Warner Entm't. Co., LP*, 901 So. 2d 802, 806 (Fla. 2005) (citing *Loft v. Fuller*, 408 So. 2d 619, 622-23 (Fla. 4th DCA 1981)).

The upgraded LinkedIn Recruiter account that Ms. Militano used during her employment was, pursuant to Section 10 of the Associate Handbook, Randstad's property that Ms. Militano would not be able to take with her once her employment with Randstad ended. (Statement of Undisputed Facts ¶¶ 2, 27). Randstad paid the licensing fee for this upgraded account, and Ms. Militano made no contribution to the cost. (*Id.* at ¶ 2). Ms. Militano acknowledged that the LinkedIn Recruiter account could be reassigned by Randstad at any time, given that the account was Randstad's property. (*Id.*) As such, the account is Randstad's property, over which Ms. Militano has no ownership rights. (*Id.*)

During Ms. Militano's employment, she shared the LinkedIn Recruiter account with other recruiters who used it frequently and with her knowledge and permission. (*Id.*)  Though the LinkedIn Recruiter account had been assigned to her during her employment, Plaintiff testified that she was aware that others in the office—in particular Christopher Rallo and Idelim Bostrom, other Executive Recruiters in Randstad's Miami office—often made frequent use of her password to contact candidates and clients for their own recruiting efforts. (*Id.*)  Upon the termination of Ms. Militano's employment, Randstad immediately transferred access to the account to another recruiter, Eric Lastre ("Mr. Lastre"), an Executive Recruiter. (*Id.*)  Subsequent messages as early as the morning of November 1, 2013, further demonstrate that the account had been transferred completely to Eric Lastre. (*Id.* at ¶ 26).

As such, no evidence exists that Mr. Lastre, Mr. Leeds, or anyone at Randstad used Ms. Militano's name to secure any commercial gain for Randstad, and the absence of such evidence is fatal to the misappropriation claim.  However, even assuming—in a light most favorable to Ms. Militano—that her name may not yet have been removed from the account, and thus, may have remained on the communication regarding Randstad's services, "[c]ourts in the Eleventh Circuit have dismissed Section 540.08 claims by summary judgment on the ground that the challenged communication did not 'directly' promote a product or service even where the defendant included the plaintiff's name on the very product it advertised and sold." *MPS Entm't, LLC v. Abercrombie & Fitch Stores, Inc.*, No. 11-24110-CIV, 2013 WL 3288039, at *13 (S.D. Fla. June 28, 2013) (O'Sullivan, J.).  *See also Lane v. MRA Holdings, LLC*, 242 F. Supp. 2d 1205, 1214 (M.D. Fla. 2002) (recognizing that § 540.08 of the Florida Statutes was meant to prevent only the unauthorized use of one's likeness where it is shown that the publisher used the individual's likeness to directly promote a product or service).  As such, Ms. Militano's claim under § 540.08 fails as a matter of law for this reason alone, as she can point to no record evidence to demonstrate the use of her likeness for commercial gain.

Likewise, no email emanating from the Randstad email account assigned to Ms. Militano during her employment provides evidence that anyone at Randstad was using her former account to solicit clients or candidates under the false pretense that they were Plaintiff.  She alleges that Randstad employees accessed the accounts and used her likeness, but she cannot point to any email in which that occurred.[10]  Randstad's Handbook provides that email accounts belong to the

---

[10] Ms. Militano's evidence of misappropriation is alleged to lie in emails that she reviewed and printed—without

company, and upon the termination of employment, an employee's account may be accessed for business continuity purposes. (Statement of Undisputed Facts, ¶ 27). In accordance with such policy, Mr. Leeds was provided access to Ms. Militano's account. In a November 14, 2013, email directed to Ms. Militano—more than two (2) weeks following notice of her termination— the client notes that she had been sending candidates to interview for an open position and was providing her with feedback on those candidates that it had seen in the preceding two weeks. (*Id.* at ¶ 28). Other than in a subsequent email, on November 14, 2013, where Mr. Leeds, who sent the email to Ms. Freitas as himself "on behalf of" Ms. Militano, notes to Ms. Freitas that he had attempted to contact the client regarding this conduct, she can point to no email where he was using her former account to send emails, let alone to client and candidates using her likeness. (*Id.*) At best, this is the only evidence that Ms. Militano has that anyone at Randstad used the account previously assigned to her following the termination of her employment, which was permitted, and Mr. Leeds identified himself clearly as the person who was sending the message. Moreover, the message was internal (to HR), and therefore, not sent for any commercial purpose. Thus, there is no evidence demonstrating the direct use of Ms. Militano's name or likeness to promote any product or service as is required to state a claim under § 540.08. *MPS Entm't, LLC*, 2013 WL 3288039, at *13.

Ms. Militano proffers nothing more than the naked assertion that anyone at Randstad has used her name and likeness for its commercial benefit. The dearth of documentary evidence to show that another Randstad employee was in fact using her name or likeness to solicit clients or candidates dooms Ms. Militano's commercial appropriation claim under § 540.08 to fail as a matter of law.

## V. CONCLUSION

For the foregoing reasons, Defendant RANDSTAD PROFESSIONALS US, LP respectfully requests that this Court (i) grant its Motion; (ii) enter summary judgment in its favor

---

authorization—from Randstad's computer systems following the termination of her employment. (Statement of Undisputed Facts ¶ 28). However, she could not point to any such documents that evidenced the use of her likeness. Following the termination of her employment on October 28, 2013, Ms. Militano was aware that she no longer would be permitted to access Randstad's computer systems. *See id.* Ms. Militano admitted that she accessed— without authorization—Randstad's computer systems and printed emails "in the days and weeks" following the termination of her employment, which is the subject of Randstad's proffered counterclaim against Ms. Militano. *See Id.*; Def.'s Countercl. ¶¶ 14-16. In both her responses to Randstad's First Set of Interrogatories and at deposition, Ms. Militano stated that she clicked on a link on Google through which she could access Randstad's communication systems and review emails. *Id.* Even if produced now, these e-mails should not be admitted as evidence for the reasons set forth in Randstad's counterclaim [ECF No. 30] and Motion for Sanctions [ECF No. 46].

and against Plaintiff VANESSA MILITANO as to all five (5) remaining counts of the Amended Complaint; and (iii) award Randstad such other and further relief as the Court deems necessary and proper.

Dated: February 6, 2015                    Respectfully submitted,

By: /s/  Arlene K. Kline_____

Arlene K. Kline
Florida Bar No. 104957
arlene.kline@akerman.com
Shayla N. Waldon
Florida Bar No. 105626
shayla.waldon@akerman.com
**AKERMAN LLP**
777 South Flagler Drive
Suite 1100, West Tower
West Palm Beach, FL, 33401
Main: (561) 653-5000
Fax: (561) 659-6313
*Attorneys for Defendant Randstad Professionals US, LP*

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on February 6, 2015, I electronically filed the foregoing with the Clerk of the Court by using CM/ECF.  I also certify that the foregoing document is being served this day on all counsel of record on the service list below in the manner specified.

By: /s/ Arlene K. Kline
ARLENE K. KLINE
Florida Bar No.: 104957

## SERVICE LIST

Spencer H. Silverglate
ssilverglate@cspalaw.com
Francisco Ramos, Jr.
framos@cspalaw.com
Craig Salner
csalner@cspalaw.com
CLARKE SILVERGLATE P.A.
799 Brickell Plaza, Suite 900
Miami, FL 33131
Tel: 305-377-0700
Fax: 305-377-7001

*Via CM/ECF*