UNITED STATES DISTRICT COURT FOR THE
SOUTHERN DISTRICT OF FLORIDA
MIAMI DIVISION

CASE NO. 14-cv-21285-O'SULLIVAN

VANESSA MILITANO, an
Individual,

    Plaintiff,

vs.

RANDSTAD PROFESSIONALS US, LP, a
Delaware Corporation,

    Defendant.
_____/

## PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT AS TO DEFENDANT'S FOURTH AND SIXTH AFFIRMATIVE DFEFENSES

Plaintiff, Vanessa Militano ("Militano"), pursuant to Federal Rule of Civil Procedure 56(a), hereby moves for summary judgment with respect to Defendant's Fourth and Sixth Affirmative Defenses.

### I. Introduction

This is a five-count action for wrongful termination based on disability discrimination and retaliation, as well as unlawful use of Plaintiff's likeness for commercial purposes. Defendant's Fourth Affirmative Defense, attempting to limit damages under the after-acquired evidence rule, is brought on non-actionable grounds. Defendant's Sixth Affirmative Defense, which attempts to avoid liability based on acts made outside the course and scope of employment, is brought based on nothing. The Court should grant partial summary judgment on these two issues, narrowing the issues to be tried and simplifying this case for the jury.

## II. Material Facts[1]

### A. Militano's Employment and Job Duties with Defendant.

Defendant employed Militano as an executive recruiter from November 2010 to October 2013 in its Miami Office. [D.E. 4]. Defendant is a global recruiting firm with offices worldwide and a net worth in excess of $23 billion. (Leeds Dep. at 230).[2] As an executive recruiter, Militano facilitated the placement of professionals in positions with third party companies in exchange for commissions. [D.E. 1]. Militano's supervisor from early 2011 until her termination was Jonathan Leeds, the Managing Director of Randstad's Miami Office. (Leeds Dep. at 21).

### B. Militano's Performance.

Militano was a consistent elite performer for Defendant. [D.E. 1]. In February 2013, she attended President's Club in Mexico, an invitation-only all-expense paid limited retreat for elite performers worldwide. (Leeds Dep. at 96). Militano also was called upon twice to speak to new hires at Defendant's "Boot Camp" training event in Fort Lauderdale, Florida. [D.E. 1]. Militano's second speaking appearance was in September 2013, one month before she was fired. (*See* Plaintiff's Responses to Defendant's First Request for Admission)(Exhibit B).

### C. Militano's Mental Health Condition.

In 2012, Militano's fellow employees alienated her both socially and professionally. [D.E. 1]. As a result, her mental health condition began to deteriorate. (*Id.*). She began treating regularly with Dr. Serge Celestin, a licensed psychiatrist, in January 2012. (*See* Celestin record excerpt)(Exhibit C). Dr. Celestin diagnosed Militano with depression. (*Id.*). Militano's depression has manifested itself with symptoms that include panic attacks and insomnia.

---

[1] Pursuant to Southern District of Florida Local Rule 56.1(a), a separate Statement of Material Facts in numbered paragraphs is filed contemporaneously with this Motion.
[2] Cited portions of Leeds' deposition are attached as Comp. Exh. A.

(Militano Dep. at 310).[3] Militano has been on prescription medication for her depression and has continued to treat with Dr. Celestin when it has been financially feasible. (*Id.* at 298). In early 2013, Militano advised her supervisor Leeds that she was seeing a psychiatrist and being treated for depression. (*Id.* at 219). Her psychiatric appointments were posted on her online work calendar, and she referenced her doctor visits in e-mails to Leeds. (Comp. Exh. E).

D.   **October 10, 2013.**

Militano attended Boot Camp as an invited speaker in late September 2013. (*See* Exhibit B). During that time, she spoke with Boot Camp Leadership about a potential Practice Director role. (Leeds Dep. at 62-63). Practice Directors are second in command in a given office and have leadership responsibilities in exchange for which the practice director receives additional commissions based on the office's performance. (*Id.*). Some Randstad offices have them and some do not. (*Id.* at 63-64). In September 2013, the Miami Office did not have a practice director. (*Id.* at 64).

In the week that followed Boot Camp, Militano asked for a sit down with Leeds to discuss the Boot Camp role. (*Id.* at 61-62). Initial attempts at meeting had to be canceled due to work conflicts. (Militano Dep. at 136). On October 10, 2013, a Thursday, Militano prepared for work after a sleepless night relating to the continuing drama at the office. (*Id.* at 143-44). Her live-in boyfriend (and now fiancé), Jorge Morales, pleaded with Militano to stay home and work remotely, something she could do with remote access. (*Id.*).[4] When Militano insisted on going to the office, Morales protested and the two argued. (*Id.*).

Militano arrived to work at approximately 11:30 a.m. due to her domestic dispute. (*Id.* at 136). She texted Leeds that she was running late and the reason why. (*Id.* at 67). After a glib

---

[3] Excerpts of Militano's deposition transcript are attached as Exhibit D).
[4] The Parties dispute whether Militano had Leeds' blessing to work from home on occasion based on her mental health condition and fragile status within the Miami Office.

response from Leeds, Militano bristled and the two had an unpleasant e-mail exchange. (Comp. Exh. F). Shortly after Militano arrived at the office, Leeds summoned her to his office. (Militano Dep. at 139). Instead of a meeting about a potential promotion, Leeds verbally lashed at Militano, telling her that she would never be promoted, that none of the higher-ups such as Recruiting Director John Ruffini or Leeds' Regional Director Macon Albertson were on her side, and that her problems with co-workers over the past year have been her own doing. (*Id.* at 139-40).

When Militano started crying at this unexpected ambush, Leeds stayed on the attack. (*Id*). He berated her about her mental condition and her medication. (*Id.*). Militano finally extricated herself from the assault, leaving the room hyperventilating and crying. (*Id.* at 141). Shortly thereafter she left the office for the day. (*Id.* at 142). Leeds did nothing more that day with respect to Militano. (Leeds Dep. at 89-90). He did not contact Human Resources to report the incident or to attempt to terminate Militano ("HR"). (*Id.*). He did not contact his supervisor Albertson requesting to terminate Militano. (*Id.*). He did not follow up with Militano. (*Id.*).

E.    **October 11, 2013.**

The next morning, with John Ruffini's assistance, Militano identified the appropriate contact in Randstad's HR department, Tina Freitas, and contacted her to report Leeds' abuse. (Exhibit G). After some phone tag, Freitas reached Militano, who relayed the events of the prior day as well as the ongoing turmoil at the office relating to her co-workers. (Freitas Dep. at 49).[5] Freitas advised that she would investigate Militano's claims, and instructed her to work from home pending her investigation. (*Id.* at 53-54)

At 11:59 a.m., after a series of harassing texts and e-mails, Militano asked Leeds to let her work in peace at home until the matter was resolved by HR. (Exhibit I). This was the first

---

[5] Excerpts of Tina Freitas' deposition transcript are attached as Comp. Exh. H.

time Leeds learned that Militano had complained to HR. (Leeds Dep. at 131-32). Leeds immediately went after Militano's job in ways he never had even come close to before. When Freitas e-mailed him to advise him to leave Militano alone, Leeds responded by asking Freitas to have Militano's remote access shut down, a request consistent with her termination. (Exhibit J). He also called Albertson, his supervisor and, *without advising of Militano's HR complaint, requested Albertson's permission to terminate her*. (Albertson Dep. at 24-25)(emphasis added).[6] When Leeds and Freitas spoke as part of Freitas' investigation later in the afternoon, Leeds characterized Militano as being "disturbed," having "major mental issues," and advised that he did not want her back in the office, which he confirmed was his way of saying he wanted her to be fired. (Exhibit L).

Freitas' discussions with Leeds and Militano on October 11, 2013 was the extent of her investigation as to whether Leeds verbally abused Militano the prior day. (Freitas Dep. at 60-61). Freitas concluded that it was an unsolvable "he said/she said," and took no action on the complaint. (*See* Exhibit L).

F. **Militano Returns to the Office.**

The following Monday, October 14, 2013, Freitas interviewed most of the remaining recruiters in the office to investigate Militano's claim of a hostile work environment. (*Id.*). Unsurprisingly, the recruiters made a series of self-serving and self-preserving comments, saying that Militano brings conflict upon herself and that Leeds is a great boss who does not micromanage personnel. (*Id.*).

Militano suddenly became the target of her own HR complaint. (Leeds Dep. at 168-169). Leeds and Freitas worked together on a series of conditions that Militano would be required to comply with as a condition of continuing to work for Randstad. (Freitas Dep. at 74-75).

---

[6] Excerpts of Macon Albertson's deposition transcript are attached as Comp. Exh. K.

Militano returned to the office on Wednesday, October 16, 2013. (Freitas Dep. at 77). Upon returning to the office, five days after engaging in protected activity, Militano was handed the final written "Office Guidelines" prepared by Leeds and Freitas. (*Id.*). Despite her elite production, despite being called upon twice to represent the company in speaking to new hires at its training programs, despite never having had a negative performance review, despite not having a single negative indicator in her personnel file, Leeds conjured up a series of criteria on which Militano allegedly was deficient. (Exhibit M).

G.  **Militano's Termination.**

Militano never had a chance upon her return. Leeds harangued her almost constantly regarding alleged petty technical violations of the guidelines, copying Freitas and Albertson on his correspondences to create a paper trail. (Comp. Exh. N). Though it was not part of her guidelines, Militano would send Leeds daily recaps of all the work she performed in an effort to keep him off her back. (Exhibit O). It did not matter. Leeds, the supposed hands off non-micro-manager, antagonized Militano despite his awareness of her mental health condition and her attempts to comply with a series of guidelines scripted specifically for her. (*See* Exhibit N). When Militano would respond to defend herself, Leeds would forward the trails to Freitas and Albertson asking for her termination. (*See* Exhibit N). Freitas and Albertson finally gave in on October 25, 2013, when the decision to terminate Militano was made. (Freitas Dep. at 107). She was advised on October 28, 2013 that she was fired. (*Id.* at 97).

H.  **Hot Jobs List**

Approximately once per week, the Miami Office conducts a "Hot Jobs" meeting attended by all recruiters. (Bostrom Dep. at 25).[7] The meetings are conducted by Leeds and cover the significant recruiting projects going on within the office. (*Id.*). At the meetings a Hot Jobs List

---

[7] Excerpts of Idelim Bostrom's deposition are attached as Exhibit P.

is circulated essentially covering the topics discussed at the meeting. (Militano Dep. at 292-93). Defendant contends that Militano absconded with the Hot Jobs list. (Freitas Dep. at 41). The sole basis? Leeds told HR that, on an unspecified date near the time of her termination, he handed out the Hot Jobs list in the morning and, at the end of the day, he went to Militano's desk after she had left and the list was not there. (*Id.*). No one saw Militano take it. (*Id.* at 41-42). No one inspected any trash receptacles to see if the piece of paper was discarded. (*Id.*). There is no evidence that Militano usurped the information on the Hot Jobs list for business purposes post-termination. (*Id.*). HR representative Tina Freitas, testifying on Defendant's behalf, confirmed that Defendant's accusation was rank speculation:

> Q. So the only explanation that Randstad has for this document is that my client must have taken it with her and there's – and the company has zero evidence to support that; isn't that right?
>
> (Objection to Form)
>
> A. **To my knowledge, yes**.

(Freitas Dep. at 42).

Following her termination, Militano did not retain any Hot Jobs materials nor, obviously, make any commercial use of them. (Militano Dep. at 292-93). This was just another example of Leeds' relentless assault on Militano after she engaged in protected activity on October 11, 2013.

### I. Defendant Alleges Militano Printed a Client List Post-Termination

Tina Freitas also testified, or at least attempted to testify above defense counsel's interference, that within Randstad, "it is believed" that Militano was able to access Randstad systems after she was terminated and printed off some client lists in the process. (Freitas Dep. at 42-43). Freitas, the designated corporate witness on this topic, confirmed that Defendant has no supporting evidence:

Q. What evidence do you have that she printed off client lists?

A. **I personally do not have the evidence. That was brought to my attention.**

. . .

Q. What was the substance of the confidential information that was allegedly taken and printed off?

A. I believe it was client lists and there was a specific – I don't recall. I believe there was a specific – exactly. I believe there was a specific incident to a specific client.

Q. And you don't know what the incident was or who the client was?

A. I don't recall the client right now.

(*Id.* at 42-45)(emphasis added).[8]

Militano did not access, print off, or make use of any client lists following her termination. (Militano Dep. at 292). She inadvertently accessed her former work e-mail account on one occasion following her termination. [D.E. 31]. That matter is discussed at length in Plaintiff's Response in Opposition to Defendant's Motion for Leave to Assert Counterclaim. (*Id.*).

### III. Relevant Procedural and Discovery Background

#### A. Defendant's Affirmative Defenses

Defendant filed its Answer and Affirmative Defenses to the Amended Complaint on April 17, 2014. [D.E. 4]. Defendant asserted thirteen affirmative defenses, two of which are at issue in this Motion. (*Id.*).

The Fourth Affirmative Defense states as follows:

---

[8] In order to get to the point where Defendant's designated corporate representative finally testified that Defendant has no evidence supporting any of these allegations, undersigned had to maneuver through several minutes of improper privilege assertions in which defense counsel essentially blocked a designated corporate representative from substantively testifying on designated topics. (*See* Freitas Dep. at 43-47).

> To the extent that Defendant discovers evidence of wrongdoing by Plaintiff, Defendant hereby invokes the after-acquired evidence rule to preclude an award of reinstatement or front pay/back pay past the time at which the Defendant discovers the new evidence.

(*Id.*).

The Sixth Affirmative Defense states as follows:

> Defendant asserts that it is not liable for any alleged wrongful actions taken by its employees that were taken outside the scope and course of their duties and were not authorized, condoned, or ratified by Defendant.

(*Id.*).

### B. Defendant's Corporate Representative Testimony

Plaintiff noticed the deposition of Defendant's corporate representative pursuant to Federal Rule of Civil Procedure 30(b)(6) on several topics, including the bases for Defendant's Fourth and Sixth Affirmative Defenses. (Exhibit Q). Defendant designated HR representative Tina Freitas to answer questions on these topics. In terms of after-acquired evidence, Freitas' testimony is summarized in Subsections II(H) and II(I) above. Defendant contends that Militano took a Hot Jobs list following her termination with no supporting evidence and further contends that Militano accessed Defendant's server post-termination and took a client list, also with no supporting evidence, or at least no evidence that defense counsel would let a corporate representative discuss during a corporate representative deposition.

As for Defendant's Sixth Affirmative Defense, Freitas confirmed that it was an empty defense based on nothing:

> Q. Randstad has another affirmative defense where it says it's not liable for any alleged wrongful act taken by its employees that were taken outside the scope and course of their duties and were not authorized, condoned, or ratified by the defendant. Are you familiar with that defense?
>
> (Objection to Form)
>
> A. Where are you referring to that? Oh, yes. Yes.

Q. What wrongful acts were taken with respect to my client by any Randstad employee or contractor that were made outside the scope and course of employment?

(Objection to Form)

A. There were no actions.

Q. Was this just a defense pled in an abundance of caution? Is there any substance to this defense?

(Objection to Form)

A. No.

(Freitas Dep. at 47-48).

## IV. Summary Judgment Standard

Federal Rule of Civil Procedure 56(a) permits parties to move for summary judgment on any claim or defense or parts thereof. Summary judgment should be granted "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact." Fed. R. Civ. 56(c); *see also Celotex Corp. v. Catrett,* 477 U.S. 317, 322 (1986). The party seeking summary judgment bears the initial burden of identifying for the district court those portions of the record "which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp.,* 477 U.S. at 323. Once the moving party has carried its burden, the non-moving party must show the existence of a genuine issue of material fact to avoid summary judgment. *Id.*

## V. Discussion

**A.    Defendant's Sixth Affirmative Defense is Supported by Nothing and Should Have Been Withdrawn.**

Defendant admitted on October 14, 2014, that its Sixth Affirmative Defense lacks any substance. (Freitas Dep. at 47-48). According to Defendant, no wrongful act occurred at the

hands of any of its employees that occurred outside the scope and course of employment. (*Id.*). The universe of alleged wrongful acts against Militano has not changed between October 14, 2014 and February 6, 2015. For reasons unknown, Defendant has maintained this Defense despite knowing that it lacks merit. Summary judgment should be granted as to Defendant's Sixth Affirmative Defense.

> **B.    Defendant's After-Acquired Evidence Defense is Based on Non-Actionable Post-Termination Conduct Precipitated by Defendant's Illegal Termination**

Defendant's Fourth Affirmative Defense, under the doctrine of after-acquired evidence, is based on two allegations – 1) Militano allegedly retained with a "Hot Jobs" list after her termination; and 2) Militano accessed and printed off a client list following her termination. Defendant's claims are logically flawed because if Militano had not been unlawfully terminated prior to these incidents, she would have been entitled to retain a Hot Jobs list or to review a client list as part of her duties as an Executive Recruiter.

The after-acquired evidence doctrine precludes or limits and employee from receiving certain remedies for wrongful discharge if the employer, after the unlawful termination, later "discovers" evidence of wrongdoing that would have led to the employee's termination had the employer known of the misconduct at the time. *McKennon v. Nashville Banner Publishing Co.*, 513 U.S. 352, 360-63 (1995).

While the Eleventh Circuit has not directly addressed the issue, several Federal courts have considered the question of whether the after-acquired evidence doctrine extends to post-termination misconduct, most of whom have rejected the proposition. *See Ryder v. Westinghouse Electric Corp.*, 879 F. Supp. 534, 537 (W.D. Pa. 1995)([after-acquired evidence] presupposes an employer-employee relationship at the time of the misconduct occurred); *Sigmon*

*v. Parker Chapin Flattau & Klimpl*, 901 F. Supp. 667 (S.D.N.Y. 1995)(Supreme Court *McKennon* decision premised on the employee's misconduct occurring during her employment).

Similarly, other Federal courts have held where the employer's illegal conduct is the but-for cause of the employee's alleged conduct being wrongful, the after-acquired evidence rule cannot be applied. *See Jones v. Nissan North America, Inc.*, 438 Fed. Appx. 388, 407 (6th Cir. 2011)(reversing lower court judgment where after-acquired evidence doctrine was applied); *Medlock v. Ortho Biotech, Inc.*, 164 F. 3d 545, 555 (10th Cir. 2011).

### C. Defendant's After-Acquired Defense is Based on Rank Speculation that Cannot Withstand Summary Judgment.

Defendant's after-acquired evidence is further barred because Defendant's allegations are based on nothing more than rank speculation. Defendant's designated corporate representative offered no supporting evidence on either the alleged Hot Jobs list heist or the accessing of a client list. As to the Hot Jobs list, the only supporting allegation is that it was not seen on Militano's desk after she was terminated. No one witnessed anything or even did anything close to an adequate inspection to see if this piece of paper was located anywhere else.

As to the alleged accessing of the client list, again Defendant's corporate representative provides no specifics, testifying that she believes there was an incident relating to a client but has no recollection of the client or the incident, and otherwise has no evidence supporting Defendant's claim, all while attempting to testify over the interfering privilege instructions of defense counsel.

Militano was questioned on both of these allegations and confirmed that 1) she did not take any Hot Jobs list; and 2) did not access Defendant's server after her termination except on one occasion where she was inadvertently directed to her former e-mail inbox while job searching.

A non-movant may not create fact issues through reliance on speculation. *Bryant v. U.S. Steel Corp.*, 428 Fed. Appx. 895, 897 (11th Cir. 2011); *Baker v. Russell Corp.*, 372 Fed. Appx. 917, 919 (11th Cir. 2010); *Cordoba v. Dillard's, Inc.*, 419 F. 3d 1169, 1181 (11th Cir. 2005) ("Speculation does not create a *genuine* issue of fact; instead, it creates a false issue, the demolition of which is a primary goal of summary judgment").

Defendant's false issues of fact do not pass the summary judgment stage.

## VI. Conclusion

Based on the foregoing, summary judgment as to Defendant's Fourth and Sixth Affirmative Defenses should be granted.

CLARKE SILVERGLATE, P.A.
*Counsel for Plaintiff, Vanessa Militano*
799 Brickell Plaza, Suite 900
Miami, Florida 33131
Telephone: (305) 377-0700
Facsimile: (305) 377-7001
By: _____
Spencer Silverglate
Florida Bar No. 769223
Francisco Ramos, Jr.
Florida Bar No. 114766
Craig Salner
Florida Bar No. 669695

CASE NO. 14-cv-21285-O'SULLIVAN

## **CERTIFICATE OF SERVICE**

WE HEREBY CERTIFY that a true and correct copy of the foregoing was served via cm/ecf procedures on this 6th day of February, 2015, to the following:

Arlene K. Kline, Esq.
AKERMAN LLP
777 South Flagler Drive
Suite 1100 West Tower
West Palm Beach, FL, 33401
arlene.kline@akerman.com

Shayla N. Waldon, Esq.
AKERMAN LLP
777 South Flagler Drive
Suite 1100 West Tower
West Palm Beach, FL, 33401
shayla.waldon@akerman.com

CLARKE SILVERGLATE, P.A.

By: _____
   Craig Salner