UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
CASE NO. 14-21285-CIV-O'SULLIVAN

[CONSENT]

VANESSA MILITANO,

      Plaintiff,

v.

RANDSTAD PROFESSIONALS US, LP,

      Defendant.

_____/

## ORDER

THIS MATTER is before the Court on the Defendant, Randstad Professionals US, LP's Motion for Summary Judgment and Incorporated Memorandum of Law (DE# 47, 2/6/15).[1]

## BACKGROUND

On March 17, 2014, the plaintiff commenced the instant action in the Circuit Court of the Eleventh Judicial Circuit in and for Miami-Dade County, Florida. In her Amended Complaint, the plaintiff asserted the following causes of action against the defendant: violation of the Americans with Disabilities Act of 1990, as amended, 42 U.S.C. § 12101, et seq. (hereinafter "ADA") - Disability/Perceived Disability Discrimination (Count I); violation of the Florida Civil Rights Act of 1992 (hereinafter "FCRA") - Handicap Discrimination (Count II); violation of the ADA - Retaliation (Count III); FCRA - Retaliation (Count IV); Unpaid Wages Pursuant to Fla. Stat. § 448.08

---

[1] The plaintiff also filed a motion for summary judgment. See Plaintiff's Motion for Summary Judgment (DE# 49, 2/6/15). That motion will be denied as moot in a separate Order.

(Count V)[2] and invasion of privacy - misappropriation of plaintiff's likeness (Count VI). See Amended Complaint (DE# 1-2 at 14-26, 4/10/14).

The defendant removed the instant case to the United States District Court for the Southern District of Florida on April 10, 2014. See Notice of Removal by Defendant (DE# 1, 4/10/14).

On February 6, 2015, the defendant filed its motion for summary judgment and statement of undisputed facts. See Defendant, Randstad Professionals US, LP's Motion for Summary Judgment and Incorporated Memorandum of Law (DE# 47, 2/6/15); Notice of Filing Defendant, Randstad Professionals US, LP's, Statement of Undisputed Material Facts in Support of Motion for Summary Judgment (DE# 48, 2/6/15). The plaintiff filed her responses to the motion and to the defendant's statement on February 23, 2015. See Plaintiff's Response in Opposition to Defendant's Motion for Summary Judgment and Incorporated Memorandum of Law (DE# 79, 2/23/15); Plaintiff's Response to Defendant's Statement of Material Facts Supporting Defendant's Motion for Summary Judgment (DE# 80, 2/23/15). The defendant filed its replies in support of the instant motion and in support of its statement of undisputed facts on March 5, 2015. See Defendant, Randstad Professionals US, LP's, Reply In Support of Motion for Summary Judgment and Incorporated Memorandum of Law [ECF NO. 47] (DE# 91, 3/5/15); Notice of Filing Defendant, Randstad Professionals US, LP's, Reply to Plaintiff's Response to Defendant's Statement of Material Facts Supporting

---

[2] On December 19, 2014, this claim was dismissed with prejudice pursuant to the parties' stipulation. See Order of Dismissal with Prejudice as to Count V Only (DE# 26, 12/19/14).

2

Defendant's Motion for Summary Judgment (DE# 92, 3/5/15). This motion is ripe for adjudication.

**FACTS**[3]

**A.      The Defendant**

Randstad Professionals US, LP (hereinafter "Randstad" or "defendant") is a global recruiting firm. It employs executive recruiters to place job candidates in employment positions. Randstad's executive recruiters earn commissions through the successful placement of job candidates. When more than one recruiter places a job candidate in a position, the recruiters will sometimes split the commissions. Part of an executive recruiter's duties include out-of-office business development and meetings with actual and potential candidates.

**B.      The Miami Office**

On November 8, 2010, the plaintiff was hired as a full-time executive recruiter in the Miami Office of The Mergis Group. The Mergis Group later became Randstad.

Jonathan Leeds was the managing director of the Miami Office for the majority of the plaintiff's employment. See Deposition of Vanessa Militano (DE# 48-2 at 6, 2/6/15). The managing director of each office ran that office and had the authority to fire recruiters without obtaining approval from Human Resources (hereinafter "H.R.") or the Legal Department. See Deposition of Tina Freitas (DE# 82-2 at 13, 2/23/15); Deposition of Jonathan Leeds (DE# 80-1 at 6, 26, 2/23/15).

Mr. Leeds was the plaintiff's direct supervisor. He was approachable as a

---

[3] When citing to the record, the undersigned will use the page numbers automatically assigned by the Court's CM/ECF system.

3

manager and was flexible with his recruiters' schedules. See Deposition of Vanessa Militano (DE# 48-2 at 6, 2/6/15). The plaintiff would send text messages to Mr. Leeds if she was not going to be in the office by 10:00 a.m. or 10:30 a.m. Id. at 7. If she was meeting a client or a candidate, she would notify Mr. Leeds. Id.

The plaintiff was a top performer in the Miami Office. In fact, in 2012, the plaintiff had the highest year-over-year growth of any recruiter in The Mergis Group. In 2013, the plaintiff was invited to attend Randstad's President's Club annual meeting based solely upon her improvement in her 2012 billings as compared to her 2011 billings. The plaintiff was also asked twice to be a speaker at a boot camp for new recruiters. The plaintiff's second boot camp speaking appearance was in September 2013, approximately one month before she was terminated from her employment with the defendant.

**C.    The Plaintiff's Verbal Altercations with Co-Workers**

The plaintiff had several verbal altercations with her Randstad co-workers during which these co-workers resorted to name-calling. At some point, the plaintiff was training Julian McKeen, another recruiter. Without provocation, "[o]ne day . . . [Mr. McKeen] got up in front of the office and . . . said nobody want[ed] to work with [the plaintiff], [and] started screaming at [her]." Deposition of Vanessa Militano (DE# 48-2 at 9, 2/9/15). He referred to the plaintiff as "pushy" and "arrogant" or words to that effect. The plaintiff did not know why Mr. McKeen lashed out at her. Id.

The plaintiff believed that another recruiter, Angie Garcia, also did not like her. According to the plaintiff, Ms. Garcia "at the time . . . had stolen a candidate from [the plaintiff]. It was very difficult [for the plaintiff] to speak with [Ms. Garcia]. She would cut

[the plaintiff] short. She would ignore [the plaintiff] when [the plaintiff] would send her e-mails." Deposition of Vanessa Militano (DE# 48-2 at 10, 2/9/15).

Sometime in 2012, the plaintiff had a verbal confrontation with Elizabeth Ramos, another recruiter in the Miami Office. Ms. Ramos barged in on a meeting between the plaintiff and Ms. Garcia. See Deposition of Vanessa Militano (DE# 48-2 at 10, 2/9/15). Ms. Ramos proceeded to call the plaintiff a "whore" and a "bitch." Id. at 11. Ms. Ramos also told the plaintiff that her days were numbered at The Mergis Group. Id. at 11, 16. The plaintiff was not terminated and no adverse employment action took place following Ms. Ramos' statements to the plaintiff.

The plaintiff wanted to go to H.R. following the incident with Ms. Ramos, but Mr. Leeds told her he would resolve the problem on his own. See Deposition of Vanessa Militano (DE# 48-2 at 16, 2/9/15). Mr. Leeds verbally reprimanded Ms. Ramos for intruding on the plaintiff's meeting with Ms. Garcia and Ms. Ramos ultimately apologized to the plaintiff. See Deposition of Elizabeth Ramos (DE# 80-25 at 5, 2/23/15). The plaintiff had no further altercations with Ms. Ramos of this nature. See Deposition of Vanessa Militano (DE# 48-2 at 16-17, 2/9/15); Deposition of Vanessa Militano (DE# 80-6 at 39-40, 2/23/15).

In November 2012, a few weeks after Ms. Ramos had apologized to the plaintiff, the plaintiff had a disagreement with Dan Fingerhut, another recruiter, over a client. The plaintiff and Mr. Fingerhut had previously dated while working together in the Miami Office. Mr. Fingerhut called the plaintiff a "c*nt" in front of everyone at the office. See Deposition of Vanessa Militano (DE# 48-2 at 11, 2/9/15). He also told her that her days

5

at The Mergis Group were numbered.[4] Id.

Mr. Fingerhut was not the plaintiff's boss and he had no control over firing decisions. See Deposition of Vanessa Militano (DE# 48-2 at 15, 2/9/15). Nonetheless, according to the plaintiff, Mr. Fingerhut "was very close to Jon" Leeds and she didn't know if Mr. Fingerhut "meant that he was going to influence [Mr. Leed]'s decision somehow or sabotage [her] career at [T]he Mergis Group." Id. The plaintiff was not terminated and no adverse employment action took place following Mr. Fingerhut's statements to the plaintiff.

After the incident with Mr. Fingerhut, Mr. Leeds asked the plaintiff and Mr. Fingerhut to go to the conference room and "work it out." Deposition of Vanessa Militano (DE# 48-2 at 17, 2/9/15). The plaintiff had no other incidents or altercations with Mr. Fingerhut. Id.

Mr. Leeds suggested that the plaintiff have one-on-one meetings with "everybody to figure out why nobody liked [her], why nobody worked in tandem with [her]." Deposition of Vanessa Militano (DE# 48-2 at 13, 2/9/15). According to the plaintiff "[her co-workers] seemed to be fine with [her] except for [Ms. Ramos]" who had "some problems that she could not get over." Id.

At some point another co-worker, John Ross, "admitted to [the plaintiff] that he

_____

[4] A co-worker, Christopher Rallo, witnessed the confrontation between the plaintiff and Mr. Fingerhut. See Deposition of Christopher Rallo (DE# 48-10 at 189, 2/6/15). According to Mr. Rallo, the plaintiff started the argument and she was the one who "aggressively approached [Mr. Fingerhut] about the issue." Id. at 190. However, Mr. Rallo prefaced his testimony by stating that his memory was "kind of faded at this point" and he could not recall some of the details. Id. at 189-190. For purposes of the defendant's summary judgment motion, the undersigned will assume that the plaintiff did not provoke Mr. Fingerhut.

did not send [her job] candidates, and that there were times where both himself and some other people in the office, including [Mr.] Fingerhut and [Ms.] Ramos, would send [the plaintiff] the wrong job description so [she] would waste [her] time working on it." Deposition of Vanessa Militano (DE# 48-2 at 20, 2/9/15). Mr. Ross did not tell the plaintiff why he and other employees would sometimes sabotage her. Id.

The plaintiff's workplace disputes with Mr. McKeen, Ms. Garcia, Ms. Ramos and Mr. Fingerhut occurred before the plaintiff had started seeing a psychiatrist or knew that she had a possible disability. See Deposition of Vanessa Militano (DE# 48-2 at 18, 2/9/15). The plaintiff testified at her deposition that she was not alleging these individuals treated her badly or differently due to an actual or perceived disability. Id.

**D.   The Plaintiff's Psychiatric Treatment**

At the beginning of 2013, Mr. Leeds allowed the plaintiff to "stay home a few days so he could resolve the situation at work" after the incidents with Ms. Ramos and Mr. Fingerhut. See Deposition of Vanessa Militano (DE# 48-2 at 37, 2/9/15). At this time, the plaintiff began seeing Dr. Serge T. Celesin, a psychiatrist. See Deposition of Serge T. Celesin (DE# 80-5, 2/23/15). When the plaintiff returned to work, she told Mr. Leeds that she had started seeing a psychiatrist and that she would need to see the psychiatrist on a monthly basis. See Deposition of Vanessa Militano (DE# 48-2 at 37, 2/9/15). Mr. Leeds indicated to the plaintiff that he was fine with that arrangement. Id.

During her employment with the defendant, the plaintiff experienced panic attacks, anxiety, paranoia, insomnia and depression. See Deposition of Vanessa Militano (DE# 80-6 at 22, 54, 2/23/15).

At some point during her medical treatment, Dr. Celesin, diagnosed the plaintiff

7

with mood disorder, not otherwise specified, and treated her for depression. <u>See</u>

Deposition of Serge T. Celesin (DE# 80-5 at 2, 2/23/15). Dr. Celesin prescribed anti-

depressants to the plaintiff and Abilify, a medication that was supposed to assist with

the anti-depressants. <u>Id.</u> at 3. Dr. Celesin made changes to the plaintiff's medication

after she was fired by the defendant.

**E.     Other Unprofessional Conduct in the Miami Office**

During a "Secret Santa" gift exchange, Ms. Ramos brought multiple adult toys to

the Miami Office. <u>See</u> Deposition of Elizabeth Ramos (DE# 80-25 at 7, 2/23/15). These

adult toys were later brought to a company bowling party and "returned to the office in

the following days and used as practical jokes." Declaration of Vanessa Militano (DE#

80-20 at ¶14, 2/23/15). Ms. Ramos would also engage in "lewd discussions" at work

concerning her love life. <u>Id.</u> at ¶16. Mr. Leeds witnessed this behavior. <u>Id.</u> at ¶¶15-16.[5]

Ms. Ramos also drank wine at lunch time in a nearby restaurant. <u>See</u> Deposition

of Elizabeth Ramos (DE# 80-25 at 9-10, 2/23/15). Ms. "Ramos would return to work

visibly intoxicated and would talk openly about how much she had to drink." Declaration

of Vanessa Militano (DE# 80-20 at ¶10, 2/23/15).[6] Ms. Garcia and Mr. Rallo would

---

[5] In an affidavit, Mr. Leeds attests that he had "no knowledge as to any conversations between employees regarding their sex lives and personal relationships outside of work." Affidavit of Jonathan Leeds (DE# 92-9 at ¶12, 3/5/15). Because Mr. Leeds' affidavit conflicts with the plaintiff's declaration in this regard, the Court will assume that Mr. Leeds was aware of this conduct for summary judgment purposes.

[6] Ms. Ramos testified that she never had more than a glass of wine with lunch. <u>See</u> Deposition of Elizabeth Ramos (DE# 80-25 at 9, 2/23/15). The plaintiff submitted a declaration wherein she states that Ms. Ramos would return to work "visibly intoxicated." Declaration of Vanessa Militano (DE# 80-20 at ¶10, 2/23/15). For purposes of ruling on the defendant's summary judgment motion, the Court will rely on the plaintiff's declaration over the testimony of Ms. Ramos.

sometimes join Ms. Ramos at this restaurant "and also would return to the office visibly intoxicated." Id. at ¶11. Randstad's company policy prohibits employees from "being under the influence of . . . alcohol" or "consuming alcohol while working or on assignment." See Company Policy (DE# 80-26 at 1, 2/23/15). Mr. Leeds was aware of this behavior and never reprimanded or terminated these employees. See Declaration of Vanessa Militano (DE# 80-20 at ¶12, 2/23/15).[7]

### F.   The LinkedIn Recruiter Account

The LinkedIn Recruiter account was an upgraded recruiter account which Randstad paid a fee to use. Only Randstad employees could use the LinkedIn Recruiter account and access to the account was considered a "privilege." Randstad granted the plaintiff access to the account during her employment. The plaintiff was never asked to contribute to the cost of this account.

The LinkedIn Recruiter account was password protected and the plaintiff shared this password with Christopher Rallo, a fellow recruiter at Randstad's Miami Office. Mr. Rallo used the LinkedIn Recruiter account "[f]airly often." Deposition of Vanessa Militano (DE# 48-2 at 24, 2/9/15). As the plaintiff explained during her deposition:

A.    Well my profile was attached to it. So if I was sending an e-mail to somebody, they would click on my name and profile and they would see I worked at Randstad.

Q.    When Chris Rallo would send an e-mail it show [sic] up under your profile as well.

---

[7] Mr. Leeds denies having any knowledge of any recruiter returning to work intoxicated. See Affidavit of Jonathan Leeds (DE# 92-9 at ¶11, 3/5/15). Because Mr. Leeds' affidavit conflicts with the plaintiff's declaration in this regard, the Court will assume that Mr. Leeds was aware of this conduct for summary judgment purposes.

A.      Correct, but his signature, or he would write his name at the end of
the e-mail so people who were reading it would be aware that the e-mail
was coming from Chris Rallo.

Id. The plaintiff also gave permission to Eric Lastre, another recruiter in the Miami

Office, to use her password to login to the LinkedIn Recruiter Account. Id. at 28.

Upon her termination, the plaintiff's access to the LinkedIn Recruiter account

was "[c]ompletely shut off." Deposition of Vanessa Militano (DE# 48-2 at 23, 2/9/15).

After her termination, the plaintiff believed other employees sent emails from the

LinkedIn Recruiter account that had the plaintiff's name on them.[8]

## G.      The Plaintiff's October 10, 2013 Meeting with Mr. Leeds

In September 2013, the plaintiff was a speaker at a boot camp for new recruiters.

During this boot camp, the plaintiff spoke to John Ruffini and another individual who

suggested to the plaintiff that she ask Mr. Leeds for an opportunity to become a

practice director.[9] See Deposition of Vanessa Militano (DE# 80-6 at 15, 2/23/15). Mr.

Ruffini is the head of recruiting at Randstad and the plaintiff considered him a mentor.

Id. at 16. Mr. Ruffini, who had no control over staffing decisions in the Miami Office, told

───────────────

[8] The plaintiff testified as follows during her deposition:

Q. Okay. It's your understanding the three individuals . . . [Braulio Pena,
Chris Rallo and Jon Leeds] sent e-mails from Randstad's [LinkedIn]
Recruiter account that had your name on it post employment?

A. Yes.

Deposition of Vanessa Militano (DE# 48-2 at 26, 2/9/15).

[9] During her deposition, the plaintiff referred to this position as both "practice
manager" and "practice director." Deposition of Vanessa Militano (DE# 48-2 at 32,
2/9/15). To avoid confusion, the Court will use the term "practice director" in this Order.

the plaintiff that "there [were] some changes going on with Randstad and that [the practice director position] could be a possible opening." Deposition of Vanessa Militano (DE# 48-2 at 33, 2/9/15).

Practice director was a title given to people with seniority or who had shown consistency over many years to receive that title. See Deposition of Jonathan Leeds (DE# 80-1 at 6, 2/23/15). Not every Randstad office had a practice director and there was no practice director position in the Miami Office during the relevant time period. Id. at 7.[10] As the managing director, Mr. Leeds had no authority over who, if anyone, obtained the practice director position. Id. at 6. That decision was within the discretion of the Vice President (Macon Albertson), although the managing director could make a suggestion. Id. at 6-7.

Upon returning from boot camp, the plaintiff sent an email to Mr. Leeds and Macon Albertson thanking them for allowing her to participate as a speaker at the boot camp. See Deposition of Vanessa Militano (DE# 80-6 at 15, 2/23/15). The plaintiff stated in her email that "if there [wa]s an opportunity for practice director, [she] would love to be considered. If [she was] not . . . a consideration, [the plaintiff wanted to know]

---

[10] Citing her own deposition testimony, the plaintiff disputes the defendant's statement that there was no practice director position "open" in the Miami Office. See Plaintiff's Response to Defendant's Statement of Material Facts Supporting Defendant's Motion for Summary Judgment (DE# 80 at 2, 2/23/15). However, in her deposition testimony, the plaintiff merely cites to the statements of Mr. Ruffini that "there should be an opportunity or an opening" in the Miami Office for practice director. See Deposition of Vanessa Militano (DE# 80-6 at 16, 2/23/15). Mr. Ruffini did not determine what positions were available in the Miami Office and the plaintiff admitted during her deposition that she was not aware of an opening for a practice director position in the Miami Office. Id. Therefore, the undisputed record evidence is that there was no practice director position open in the Miami Office at the time the plaintiff sought this position.

11

what . . . [she] need[ed] to do for the following year in order to ramp up for that." Id.

The plaintiff requested a meeting with Mr. Leeds in order to discuss the practice director position. That meeting was scheduled for sometime in early October 2013, but was later canceled.[11] The meeting ultimately took place on October 10, 2013.

On the morning of October 10, 2013, the plaintiff had an argument at home with her boyfriend. The plaintiff sent a text message to Mr. Leeds and a co-worker, Idelim Bostrom, explaining that she would be late to the office because she and her boyfriend had had a dispute. The plaintiff was scheduled to interview two candidates that morning.[12] She called Ms. Bostrom and asked her to cover the interview for her because she would not make it to the office in time for the interview. See Deposition of Idelim Bostrom (DE# 48-6 at 6, 10, 2/6/15).[13]

---

[11] The parties dispute who canceled the initial meeting. During her deposition, the plaintiff testified that it was Mr. Leeds who canceled the meeting. See Deposition of Vanessa Militano (DE# 80-6 at 14, 2/23/15). Mr. Leeds testified that it was the plaintiff. See Deposition of Jonathan Leeds (DE# 80-1 at 8, 2/23/15). This factual dispute over who canceled the meeting is not material to the Court's analysis.

[12] The plaintiff disputes that she missed a meeting the morning of October 10, 2013 without any citation to the record. See Plaintiff's Response to Defendant's Statement of Material Facts Supporting Defendant's Motion for Summary Judgment (DE# 80 at 2, ¶12, 2/23/15).

[13] The plaintiff states that "[Ms.] Bostrom covered a meeting for [her] later due to [Mr.] Leeds insisting on speaking with [the plaintiff] at the same time as her meeting." Plaintiff's Response to Defendant's Statement of Material Facts Supporting Defendant's Motion for Summary Judgment (DE# 80 at 2, ¶12, 2/23/15). Again, the plaintiff fails to include a record citation for this factual assertion. At the summary judgment stage, it is not enough for the plaintiff to simply deny the factual record or make her own unsupported factual statements. As the non-movant, the plaintiff must proffer evidentiary support from the record. See So. Solvents, Inc. v. New Hampshire, Ins. Co., 91 F. 3d 102, 104 (11th Cir. 1996) (per curiam) (stating that when the movant meets its burden on summary judgment, "the non-movant must then designate, by affidavits, depositions, admissions, and answers to interrogatories, specific facts showing the

The plaintiff arrived at the office at approximately 11:30 a.m. on October 10, 2013 and met with Mr. Leeds that day at approximately 2:30 p.m. See Deposition of Vanessa Militano (DE# 80-6 at 14, 16, 2/23/15). The plaintiff described her October 10, 2013 meeting with Mr. Leeds as follows:

A. No. I walked into the office, and before he could even sit down or completely shut the door, he said, you are never going to be practice director here.

Q. Okay. Did he tell you why?

A. No. He just said you are never going to be practice director here.

Q. He did not give you a reason at that time?

A. No.

Q. And what was your response to that?

A. I said why. And he said, if you think Macon [Albertson] or John Ruffini are your friends, they are not your friends. The incidents that happened last year they were all because of you. You seclude yourself. You alienate yourself.

I started getting upset. I started crying. I did not know what that had to do with the one-on-one conversation we were supposed to have. **And he said, you know, I thought your mental state was a lot better this year than it was last year. You should go back to your doctor and ask for either a new medication or tell them to increase your medication.**

And that was the gist of the meeting that I thought we were supposed to have, you know, determining whether or not I was a good fit for the practice director position.

---

existence of a genuine issue for trial."). The plaintiff has not done so in this instance. As such, the Court will rely on the factual record over the plaintiff's denials or unsupported factual assertions.

Id. at 17-18 (emphasis added).[14] In a later part of deposition, the plaintiff states that during this meeting, Mr. Leeds:

> accused [her] of bringing last year upon [herself]. [She was] the one that caused the issues and not anyone else. [She was] in need of stronger medication or in need of going to another doctor for new medication. He said [that the plaintiff's] breakdown last year was caused by [her] drug binge.

Id. at 36. The plaintiff left Mr. Leeds' office "crying and hyperventilating." Id. at 19. The plaintiff "told [Mr. Leeds she] was going to leave at that time. He said, fine, just go ahead. And [she] had [co-workers] gather [her] things, and they met [her] outside to calm [her] down." Id. at 20.

When the plaintiff left the Miami Office on October 10, 2013, Mr. Leeds assumed that she had resigned. See Deposition of Jonathan Leeds (DE# 80-1 at 9, 2/23/15). From that time until the plaintiff spoke to H.R., Mr. Leeds had temporary access to the

---

[14] The parties sharply dispute the substance of Mr. Leeds' statements to the plaintiff during the October 10, 2013 meeting. The defendant maintains that:

> Mr. Leeds never made any comments to [the p]laintiff about her alleged mental condition, and none of the employees who sit within feet of the office that [the p]laintiff and Mr. Leeds were occupying, which has a large glass window, heard that Mr. Leeds made such a statement. Moreover, throughout the entire discussion, Mr. Leeds appeared and remained very calm in the face of [the p]laintiff's boisterous conduct and raising her voice.

Notice of Filing Defendant, Randstad Professionals US, LP's, Reply to Plaintiff's Response to Defendant's Statement of Material Facts Supporting Defendant's Motion for Summary Judgment (DE# 92-1 at 5, 3/5/15) (internal citations to the record omitted). For summary judgment purposes, the Court will rely on the plaintiff's deposition testimony concerning statements made by Mr. Leeds during the October 10, 2013 meeting. See Grant v. Kash n' Karry Food Stores, Inc., No. 8:07-cv-2086-T-33EAJ, No. 2009 WL 2163111, at *2 (M.D. Fla. July 17, 2009), aff'd on other grounds, 390 F. App'x 943 (11th Cir. 2010) (assuming that manager made racially charged statements to the plaintiff for summary judgment purposes).

14

plaintiff's work email account. <u>See</u> Deposition of Tina Freitas (DE# 80-2 at 25, 12, 2/23/15). Mr. Leeds believed that the plaintiff should not have access to Randstad's proprietary information after her presumed resignation. <u>See</u> Deposition of Jonathan Leeds (DE# 48-4 at 112, 2/6/15).

**H.     The Plaintiff's Complaint to H.R.**

On October 11, 2013, the plaintiff left a voicemail and sent an email to Tina Freitas, the Senior Manager of Randstad's H.R. Department, in Massachusetts. <u>See</u> Email (DE# 80-10 at 1, 2/23/15). When the plaintiff spoke to Ms. Freitas at approximately 11:00 a.m. that day, the plaintiff raised numerous complaints about the Miami Office and told Ms. Freitas about her altercation with Mr. Leeds the previous day. <u>See</u> Deposition of Tina Freitas (DE# 80-2 at 7, 2/23/15). During this conversation, the plaintiff relayed to Ms. Freitas that Mr. Leeds had called her a "liar" and told her she needed more medication. <u>Id.</u>

The plaintiff's telephone conversation with Ms. Freitas lasted approximately an hour. <u>See</u> Deposition of Tina Freitas (DE# 80-2 at 9, 2/23/15). At the end of the conversation, Ms. Freitas told the plaintiff that she would be investigating the matter. <u>Id.</u> at 8-9. Ms. Freitas advised the plaintiff to work from home during the investigation. <u>Id.</u> at 9.

On the same day at 10:43 a.m., Mr. Leeds sent an email to the plaintiff with the subject line: "call me." <u>See</u> Email (DE# 80-31 at 2, 2/23/15). There was no content in the body of the email. <u>Id.</u> The plaintiff sent an email to Mr. Leeds at 11:14 a.m. stating:

Jon,

> I will not be in today and working from home. I asked [a co-worker] to get
>
> specific items I need, so I would appreciate it if you allowed her.

Id. at 4.

At 11:55 a.m., Mr. Leeds sent an email to the plaintiff stating: "I am assuming you resigned since you have not called me and are not at work. I would hoped [sic] at least you would have called and discussed with me first." Email (DE# 80-12 at 1, 2/23/15). Approximately four minutes later, the plaintiff sent her response email stating:

> Jon,
>
> Please allow me do my job at home and in peace until the issue is
>
> resolved by HR[.]

Id. At noon, the plaintiff forwarded Mr. Leeds' email to Ms. Freitas stating:

> Tina,
>
> Please call me. I informed my MD that I'm working from home and he's
> emailing me, see below.
>
> This is an urgent matter please call[.]

Email (DE# 80-13 at 2, 2/23/15). In response, Ms. Freitas sent an email to Mr. Leeds at 12:22 p.m. asking him not to "reach out" to the plaintiff until Ms. Freitas spoke with him. Id. at 1-2. Ten minutes later, Mr. Leeds sent a response email to Ms. Freitas asking if he or Ms. Freitas could "have the help desk please shut down [the plaintiff's] email." Id. at 1. Ms. Freitas responded to Mr. Leeds' email at 12:38 p.m. stating "Please do not shut down her access[.]" Id.

Approximately half an hour or an hour after she spoke with the plaintiff, Ms. Freitas spoke with Mr. Leeds. See Deposition of Tina Freitas (DE# 80-2 at 10, 2/23/15).

16

Mr. Leeds had sent Ms. Freitas an email stating that he had not heard from the plaintiff and that she had resigned. Id. Ms. Freitas explained to Mr. Leeds that she had received a telephone call and an email from the plaintiff, that the plaintiff had not resigned and told him to "hold off." Id. at 10, 12. Ms. Freitas also told Mr. Leeds that the plaintiff had complained to her about the incident that had occurred the day before. Id. at 12-13.

During this telephone conversation, Mr. Leeds told Ms. Freitas that the plaintiff was "disturbed" and that she had "major mental issues." See Deposition of Tina Freitas (DE# 80-2 at 12, 2/23/15). He also told Ms. Freitas that the plaintiff had had a mental breakdown the prior year. Id. During this call, Mr. Leeds relayed to Ms. Freitas that the plaintiff had told him she was on mental health medication. Id. at 13. He also communicated to Ms. Freitas that the plaintiff had caused a disruption in the office and he wanted her terminated. Id.[15]

---

[15] The defendant maintains that "Mr. Leeds did not seek the termination of [the p]laintiff's employment . . . during his conversation with Ms. Freitas on October 11, 2013." Defendant, Randstad Professionals US, LP's, Reply In Support of Motion for Summary Judgment and Incorporated Memorandum of Law [ECF NO. 47] (DE# 91 at 8, 3/5/15). However, Ms. Freitas' deposition testimony states otherwise:

Q. And how long was it between the end of your call with Miss Militano and the beginning of your call with Mr. Leeds?

A. I don't recall. Maybe half hour, an hour.

\*\*\*

**Q. And during that call, Mr. Leeds advised that he wanted Miss Militano terminated; isn't that right?**

**A. He had -- he had stated -- yes**, because she had walked out of the office and the disruption that she's created in the office, he-- yes. For those reasons.

On the same day, Mr. Leeds called Macon Albertson (Randstad's Vice President). See Deposition of Macon Albertson (DE# 80-14 at 2, 2/23/15). Mr. Leeds told Mr. Albertson about some of the problems he had had with the plaintiff that week. Id. Mr. Leeds did not tell Mr. Albertson that the plaintiff had complained to H.R. Id. During this conversation, Mr. Leeds asked Mr. Albertson if he could terminate the plaintiff. Id.

Notwithstanding Mr. Leeds' requests to Ms. Freitas and Mr. Albertson, the plaintiff was not terminated and her access to her work email was not cut off that day.

## I.  H.R.'s Investigation

Ms. Freitas proceeded with her investigation by interviewing every employee in the Miami Office. In addition to her complaints about Mr. Leeds, the plaintiff also complained about a hostile work environment in the Miami Office. See Deposition of Tina Freitas (DE# 80-2 at 16, 2/23/15). As such, one of the main objectives of Ms. Freitas' investigation was to determine whether a hostile work environment existed. Id. at 15.

Mr. Leeds and the plaintiff did not identify any witnesses to their altercation and Ms. Freitas' investigation uncovered none. Ms. Freitas ultimately determined that she could not resolve a "he said/she said" dispute. See Deposition of Tina Freitas (DE# 80-2 at 14, 2/23/15). Ms. Freitas also concluded that there was no hostile work

---

**Q. This was the first time you spoke with Mr. Leeds where he had asked you for Miss Militano to be terminated; isn't that right?**

**A. Yes.**

Deposition of Tina Freitas (DE# 80-2 at 10-13, 2/23/15) (emphasis added).

environment in the Miami Office and "that in fact [the plaintiff] was actually disruptive in the office herself." Id. at 16. Ms. Freitas' conclusion that the plaintiff had been disruptive was based on her interviews of the other employees in the Miami Office. Id. at 18. During these interviews, Ms. Freitas learned of the past altercations the plaintiff had had with her co-workers.

Upon the conclusion of her investigation, Ms. Freitas called the plaintiff and told her "there was no merit to [the plaintiff's] allegations" concerning Mr. Leeds. See Deposition fo Vanessa Militano (DE# 80-6 at 38, 2/23/15). Ms. Freitas also told the plaintiff that the incidents with the other employees in the Miami Office "had happened after a certain time period, and she . . . could not do anything about it at that point." Id.

Ms. Freitas and Mr. Leeds worked on a set of written office guidelines for the plaintiff to follow upon her return to the Miami Office. See Deposition of Tina Freitas (DE# 80-2 at 17, 2/23/15). It was Mr. Leeds' idea to write the guidelines down for the plaintiff. Id. at 19. Mr. Leeds told Ms. Freitas that the guidelines were already in place (given verbally). Id. at 18-19. However, there were no written office guidelines for the Miami Office before that time.[16]

---

[16] The defendant relies on Mr. Leeds' deposition testimony that there were existing verbal guidelines in the Miami Office. See Deposition of Jonathan Leeds (DE# 48-5 at 8, 2/6/15). The plaintiff cites to her own competing deposition testimony that she was never told to comply with any of the items on the written guidelines until her return to the Miami Office on October 16, 2013. See Deposition of Vanessa Militano (DE# 80-6 at 42-44, 58-59, 2/23/15). Whether there were verbal office guidelines in place at the Miami Office is not a material issue of fact because the imposition of written guidelines on the plaintiff was not an adverse employment action, as discussed in more detail below.

**J.      The Plaintiff's Return to the Miami Office Following the H.R. Investigation**

The plaintiff returned to the Miami Office on October 16, 2013. See Deposition of

Tina Freitas (DE# 80-2 at 19-20, 2/23/15). Upon her return, Mr. Leeds presented the

plaintiff with written office guidelines entitled, "Office Guidelines for Vanessa Militano."

Id. at 20; Office Guidelines (DE# 80-16, 2/23/15). The guidelines stated in their entirety:

> Office arrival time is 10:00 AM[.]
>
> You are expected to work a minimum of 8 hours per day[.]
>
> If Interviews are scheduled and another recruiter has to fill in for that
> interview- they will split the candidate ownership 50/50[.]
>
> Time Off -You have utilized all of your vacation days for the year. There
> are no more vacation days allowed for 2013.
>
> No more unexcused absences without a doctor's note.
>
> Weekly Metrics need to be met – Phone Time and Face to Face Meetings
> with Candidates and Clients[.]
>
> There will be no working from home[.]
>
> If you are out of the office for any reason you must respond to emails and
> calls by the office, candidates and clients[.]

Office Guidelines (DE# 80-16, 2/23/15). No other employee in the Miami Office was

presented with written office guidelines.

On her first day back, the plaintiff left the Miami Office at 4:45 p.m. to attend a

previously scheduled work meeting. See Declaration of Vanessa Militano (DE# 80-20 at

¶5, 2/23/15). The plaintiff notified Mr. Leeds after the fact, on October 17, 2013, that the

reason she left the office early the day before was work related. See Emails (DE# 92-4

at 2-3, 3/5/15).[17]

In the interim, Mr. Leeds had sent an email to Mr. Albertson and Ms. Freitas on October 16, 2013 notifying them that the plaintiff had arrived at 9:50 a.m., but had left at 4:45 p.m. on her first day back to the office. See Email (DE# 80-18 at 1, 2/23/15). Ms. Freitas' responded to Mr. Leeds' email on October 18, 2013 as follows: "Let's monitor and if this continues next week you should sit her down or send an email" to her. Id. She advised Mr. Leeds on how to word that email and told him that he needed to enforce "these expectations . . . for all in the office as far as working an 8 hour day." Id.

On October 23, 2013 at 8:11 a.m., Mr. Leeds wrote an email to the plaintiff

_____

[17] The parties dispute whether the plaintiff was arriving late and leaving early after her return to the Miami Office on October 16, 2013. The defendant relies on Mr. Leeds' testimony that the plaintiff was not keeping her hours as required by the written office guidelines. See Deposition of Jonathan Leeds (DE# 48-5 at 10-11, 2/6/15). The plaintiff cites her own declaration wherein she states in a general manner that from October 16, 2013 until her termination on October 28, 2013, she "always began work by 10:00 a.m. at the latest and worked well over eight hours per day" and that if she "ever arrived to the office after 10:00 a.m., it was due to continuing to have meetings scheduled during [her] commute to the office, meetings of which [she] informed Mr. Leeds." Declaration of Vanessa Militano (DE# 80-20 at ¶7, 2/23/15). During her deposition, the plaintiff acknowledged that she was not in the office every day by 10:00 a.m. in the weeks preceding her termination. See Deposition of Vanessa Militano (DE# 48-3 at 21, 2/6/15). At an administrative hearing prior to the filing of the instant action, the plaintiff similarly testified that she was not in the office by 10:00 a.m. everyday because she construed Mr. Leeds' directive that she be in the office by 10:00 a.m. to mean that she needed to be working by that time (i.e., meeting with clients and candidates), not that she needed to physically be present at the office by 10:00 a.m. See Transcript (DE# 48-12 at 12-13, 2/6/15).

Nonetheless, because the Court will assume the plaintiff was not terminated for attendance reasons, see discussion infra, the Court finds that whether the plaintiff arrived to work late and left early in the weeks preceding her termination is not a material issue of fact in the instant case.

stating the following:

> You need to be in the office by 10 am [sic] as discussed in your first day back from being out of my office. You came in at 1045am [sic] yesterday. I don't care how late you stay in the office. Nothing is productive in this industry that late.

See Email (DE# 80-19 at 1, 2/23/15). The plaintiff sent an email to Mr. Leeds at 1:05 p.m. on the same day stating: "I see everyone come into the office between 9:00 and 10:15 a.m. and end their days at 3:00 p.m. or 4:45 p.m." Deposition of Vanessa Militano (DE# 48-3 at 24, 2/6/15).[18] Mr. Leeds forwarded the plaintiff's email to Ms. Freitas and Mr. Albertson stating: "Won't tolerate this - I am sorry guys - this is too much for me." See Email (DE# 80-18 at 3, 2/23/15). Ms. Freitas responded to Mr. Leeds' email by stating: "I just got off the phone with [the plaintiff]. Jon do you have time to talk later[?]" Id.

Ms. Freitas' request to speak with Mr. Leeds was in response to a conversation she had had with the plaintiff earlier that day. The plaintiff had sent an email to Ms. Freitas. See Deposition of Vanessa Militano (DE# 48-3 at 17-18, 2/6/15). In that email, the plaintiff advised Ms. Freitas that she believed Mr. Leeds was retaliating against her. Id. The plaintiff also spoke to Ms. Freitas on the telephone about her retaliation concerns. See Deposition of Tina Freitas (DE# 48-9 at 13, 2/6/15).

Ms. Freitas spoke to Mr. Leeds on the telephone either on October 23, 2013 or October 24, 2013. See Deposition of Tina Freitas (DE# 48-9 at 13, 2/6/15). The

---

[18] The Court was unable to locate a complete copy of the October 23, 2013, 1:05 p.m. email from the plaintiff to Mr. Leeds. The defendant did not file this email and the plaintiff only included the header of this email. See Email (DE# 80-18 at 3, 2/23/15). At least a portion of this email was read during the plaintiff's deposition as quoted above.

substance of their conversation was that "[the plaintiff] had come to [Ms. Freitas] feeling that she was being retaliated against." Id.

### K.  The Plaintiff's Conversation with Information Technology Representative Rhonda Reid

On October 24, 2013, the plaintiff contacted Randstad's Information Technology department (hereinafter "IT") and spoke with Rhonda Reid. See  Affidavit of Rhonda Reid (DE# 48-15 at ¶¶ 3, 5, 2/6/15). The plaintiff asked Ms. Reid how she could change the password on her Randstad email account. Id. at ¶5. During this conversation, the plaintiff "became upset and irate with [Ms. Reid], insisting that her password had been compromised and that her manager was monitoring her emails." Id. at ¶6. She "interrogate[d Ms. Reid] in a rude, disrespectful manner regarding the IT protocol for telling an employee to change her password, as well as for permitting the monitoring of an employee's account, and she wanted [Ms. Reid] to point her to a specific policy on these issues." Id. at ¶7.[19] Ms. Reid perceived the plaintiff to be "combative and argumentative" during this conversation and the plaintiff "was very demanding about her attempts to get what she wanted." Id. at ¶9.

Following her interaction with the plaintiff, Ms. Reid called Ms. Freitas. She

---

[19] The plaintiff disputes that she was rude to or belligerent with Ms. Reid. The only record evidence she cites is Ms. Reid's October 24, 2013 email wherein she recounts her conversation with the plaintiff, but makes no reference to the plaintiff's attitude towards her. This is insufficient evidence to create a genuine issue of fact. In her October 24, 2013 email, Ms. Reid makes no statements about the plaintiff's demeanor whatsoever. Thus, it is not a contradictory statement on the record. Moreover, Ms. Reid has filed an affidavit wherein she attests to her unpleasant interaction with the plaintiff. See Affidavit of Rhonda Reid (DE# 48-15 at ¶11, 2/6/15). Thus, the undersigned concludes that the undisputed record evidence is that the plaintiff was rude to Ms. Reid during their October 24, 2013 conversation.

"explained to Ms. Freitas that [the plaintiff] yelled at [her] and was otherwise extremely disrespectful, despite [Ms. Reid's] attempts to help her . . . change her password." Affidavit of Rhonda Reid (DE# 48-15 at ¶11, 2/6/15). She also told Ms. Freitas that "[the plaintiff] had raised her voice and she was very confrontational." Deposition of Tina Freitas (DE# 48-9 at 18-19, 2/6/15).

Per Ms. Freitas' instructions, Ms. Reid memorialized her conversation with the plaintiff in an email dated that same day. See Email (DE# 80-32 at 1, 2/23/15). In her email documentation, Ms. Reid did not indicate that the plaintiff was belligerent or rude to her. Id.

Mr. Leeds also called Ms. Freitas about the plaintiff's interaction with Ms. Reid. See Deposition of Tina Freitas (DE# 48-9 at 19, 2/6/15). He told Ms. Freitas that he had overheard "[the plaintiff] on the phone with IT and that the conversation was heated." Id. at 19-20. Mr. Leeds was only privy to the plaintiff's side of the conversation. Id.

**L.    The October 25, 2013 "Hot Jobs" Meeting**

On October 25, 2013,[20] Mr. Leeds conducted a "hot jobs" meeting with the recruiters in the Miami-Office. During her deposition, the plaintiff described a "hot jobs" meeting as:

> When we go over all of the hot jobs that we should be working on, the activity of the hot jobs, who has been interviewing. Who is not being considered. It is our staff meeting.

---

[20] The parties dispute the date on which the Hot Jobs meeting took place. The defendant maintains that the meeting was on October 23, 2013. See Affidavit of Jonathan Leeds (DE# 92-9 at ¶14, 3/5/15). The plaintiff states that it occurred on October 25, 2013. See Declaration of Vanessa Militano (DE# 80-20 at ¶6, 2/23/15). For summary judgment purposes, the Court will accept the plaintiff's date of October 25, 2013.

Deposition of Vanessa Militano (DE# 80-6 at 45, 2/23/15).

Mr. Leeds spoke last at the meeting, and during his presentation, recounted an incident where a job placement could not be made. The plaintiff made a comment about the failed job placement which Mr. Leeds did not hear.

In an email sent to Mr. Leeds on the same day at 3:02 p.m., the plaintiff made reference to the comment she made during the Hot Jobs meeting:

> You don't need to be rude, Jon. You said there are problems with the offer – and you don't think the money is there.
>
> I said "it sounds like someone didn't handle it properly."
>
> Between the profanity, degrading language, and inappropriate conversations during our meetings, I'll try not mumble [sic] about important things that I have a say in.
>
> Thanks for the feedback[.]

Email (DE# 80-18 at 4, 2/23/15).[21]

---

[21] The defendant maintains that during this meeting, the plaintiff said to Mr. Leeds, "way to handle your f***ing clients," or similar words, and walked out of the meeting. See Deposition of Jonathan Leeds (DE# 48-5 at 13, 2/6/15). Although Mr. Leeds did not hear the plaintiff's words, two co-workers, Idelim Bostrom and Angie Garcia, did. See Deposition of Idelim Bostrom (DE# 48-6 at 3, 2/6/15); Declaration of Angela Rodriguez, f/k/a Angela Garcia (DE# 48-8 at ¶¶10-11, 2/6/15). According to Ms. Bostrom, the plaintiff "seemed upset, she stood up and she said . . . something to the fact of way - 'Way to f***ing handle your  - - your client' . . . and walked out." Deposition of Idelim Bostrom (DE# 48-6 at 3, 2/6/15). Ms. Bostrom also testified that she did not discuss the plaintiff's comment with Mr. Leeds. See Deposition of Idelim Bostrom (DE# 80-22 at 3, 2/23/15). According to Ms. Garcia, the plaintiff told Mr. Leeds "'way to f***ing manage your client' before storming out of the meeting." Declaration of Angela Rodriguez, f/k/a Angela Garcia (DE# 48-8 at ¶11, 2/6/15). In his affidavit, Mr. Leeds attests that he learned of the profanity used by the plaintiff prior to her termination. Affidavit of Jonathan Leeds (DE# 92-9 at ¶16, 3/5/15).

The plaintiff disputes that she walked out on the hot jobs meeting or that she used profanity. With respect to the "Hot Jobs" meeting, the plaintiff states:

Mr. Leeds forwarded the plaintiff's email to Mr. Albertson, Ms. Freitas and a third

individual with the comment:

> I really want to respond but I am seriously biting my tongue – I am not going to respond verbally in writing [sic] even though I feel I should. Honestly you guys are now putting me a very bad situation here. She should have been out of here this morning.

Id.

## M.    The Plaintiff's Termination from Randstad

Ms. Freitas made the decision to terminate the plaintiff. See Deposition of

Jonathan Leeds (DE# 92-2 at 18, 3/5/15).[22] The decision to terminate the plaintiff was

---

> I attended a "Hot Jobs" office meeting on October 25, 2013. I did not walk out of the meeting early, nor did I curse at my supervisor Jonathan Leeds. Following an anecdote about an unsuccessful job placement, I said that "It sounds like someone did not handle it properly." My comment was not directed at Mr. Leeds or anyone in particular.

Declaration of Vanessa Militano (DE# 80-20 at 2, ¶6, 2/23/15).

Because the parties dispute the substance of the plaintiff's comment made during the Hot Jobs meeting and whether or not she walked out of that meeting, the undersigned will rely on the plaintiff's version of these events in ruling on the defendant's summary judgment motion.

[22] During his deposition, Mr. Leeds explained that the decision to terminate the plaintiff's employment was made by Ms. Freitas:

Q. What was your role in the decision to terminate [the plaintiff]?

A. So upon Vanessa returning, she had obviously come in late. She had left early. She was, you know, insubordinate to me. She would write e-mails to me about, you know, what I thought was very insubordinate.

I had a hot jobs meeting. She stood up and walked out. I had Idelim Bostrom sit right next to her and she said way to handle your f***ing clients and walked out of the meeting which is witnessed. You can write that, Idelim Bostrom who was sitting right next to her in the meeting. And she said way to handle your f***ing clients.

26

made on October 25, 2013. <u>See</u> Deposition of Tina Freitas (DE# 80-2 at 26, 2/23/15).

On or about that date, Ms. Freitas emailed Hope Zaid, the H.R. Manager in the Ft.

Lauderdale Office and instructed her to prepare a separation agreement for the plaintiff.

<u>Id.</u> at 20. The plaintiff was terminated on October 28, 2013. <u>See</u> Deposition of Tina

_____

> She mumbled it so I didn't hear it, but I asked Idelim what she said. And walked out of my meeting. So I'd say that's pretty bad to talk to a boss that way.
>
> And you know, just her overall behavior, you know, that when she was back. And so I told HR that, you know, this is enough. She came back, this is the things that happened. **And HR decided to take it on their own hands to let her go.**
>
> **I didn't actually do it. It was Tina Freitas** and one of our HR directors, who sits in Fort Lauderdale, actually called her into the office there.
>
> Q. Well, I'm talking specifically about the decision to terminate her. You essentially told HR that you want her to be terminated?
>
> A. Yeah.
>
> Q. And that was actually -- don't you have the discretion to terminate somebody?
>
> A. I do.
>
> Q. So this was your decision?
>
> [Counsel for the defendant]: Objection as to form. And also I  would caution you as to disclosing any attorney/client privileged communications.
>
> Otherwise you can answer.
>
> **THE WITNESS: Okay. In this matter, HR advised that they let her go.**

Deposition of Jonathan Leeds (DE# 92-2 at 17-18, 3/5/15) (emphasis added). Thus, it

was Ms. Freitas who made the decision to fire the plaintiff.

Freitas (DE# 80-2 at 26, 2/23/15).

Ms. Freitas terminated the plaintiff for failing to meet guidelines and for

insubordination following her return to the Miami Office after the H.R. investigation. Ms.

Freitas explained the plaintiff's insubordination as follows:

> A.     She walked out of a meeting that Jon [Leeds] was having with the
> team; she was coming in late and leaving early without notifying Jon
> where she was going to be; she was at client visits but she wasn't
> recording them in the system; she also was very confrontational with
> myself as well as with an IT member as well; she was disruptive when she
> came back to the office.
>
> Q.     Elaborate on that, please. How was she disruptive?
>
> A.     She was going around the office talking to other employees about
> Jon and, you know, when people were behind closed doors she would ask
> questions, Do you think that they're talking about me?
>
> Q.     Were you a witness to any of these discussions?
>
> A.     I was not, but I spoke with one of the employees, I believe it was --
> it was either Angie [Garcia] or Idelim [Bostrom], that had overheard that
> and had mentioned that to Jon who in turn mentioned it to myself.

Id. at 24.

After her termination, the plaintiff's access to her Randstad email was

immediately shut down and her LinkedIn Recruiter account was reassigned to another

executive recruiter, Eric Lastre.

On December 13, 2013, the plaintiff filed her Charge of Discrimination alleging

discrimination and retaliation on the basis of an alleged mental disability.

## STANDARD OF REVIEW

The Court, in reviewing a motion for summary judgment, is guided by the

standard set forth in Federal Rule of Civil Procedure 56(a). Rule 56(a) states relevant

part, as follows:

> A party may move for summary judgment, identifying each claim or defense – or the part of each claim or defense – on which summary judgment is sought. The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.

Fed. R. Civ. P. 56(a).

The moving party bears the burden of meeting this exacting standard. Celotex Corp. v. Catrett, 477 U.S. 317, 322-323 (1986); Adickes v. S.H. Kress & Co., 398 U.S. 144, 157 (1970). That is, "[t]he moving party bears the initial responsibility of informing the . . . court of the basis for its motion, and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact." United States v. Four Parcels of Real Prop., 941 F.2d 1428, 1437 (11th Cir. 1991) (quoting Celotex, 477 U.S. at 323) (internal quotation marks omitted).

In assessing whether the moving party has satisfied this burden, the Court is required to view the evidence and all factual inferences arising therefrom in the light most favorable to the non-moving party. Batey v. Stone, 24 F.3d 1330, 1333 (11th Cir. 1994). Summary judgment is appropriate when there is no dispute as to any material fact and only questions of law remain. Reich v. John Alden Life Ins. Co., 126 F.3d 1 (1st Cir. 1997).  If the record presents factual issues, the Court must deny the motion and proceed to trial. Adickes, 398 U.S. at 157; Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986).

Despite these presumptions in favor of the non-moving party, the Court must be mindful of the purpose of Rule 56 which is to eliminate the needless delay and expense

29

to the parties and to the Court occasioned by an unnecessary trial. <u>Celotex</u>, 477 U.S. at

322-323. Consequently, the non-moving party cannot merely rest upon his or her bare

assertions, conclusory allegations, surmises or conjectures.  <u>Id.</u>  As the Supreme Court

noted in <u>Celotex</u>:

> [T]he plain language of Rule 56(c) mandates the entry of summary
> judgment . . . against the party who fails to make a showing sufficient to
> establish the existence of an element essential to the party's case, and on
> which the party will bear the burden of proof at trial.  In such a situation,
> there can be "no genuine issue as to any material fact," since a complete
> failure of proof concerning an essential element of the non-moving party's
> case necessarily renders all other facts immaterial.

<u>Id.</u> at 322-323. Thus, the mere existence of a scintilla of evidence in support of the non-

moving party's position is insufficient. There must be evidence on which the jury could

reasonably find for the non-movant. <u>Anderson</u>, 477 U.S. at 251; <u>Matsuchita Elec. Indus.</u>

<u>Co. v. Zenith Radio Corp.</u>, 475 U.S. 574, 586-87 (1986).

## <u>ANALYSIS</u>

The defendant seeks final summary judgment on the plaintiff's remaining claims:

violation of ADA Disability/Perceived Disability Discrimination (Count I), violation of

FCRA - Handicap Discrimination (Count II); violation of ADA - Retaliation (Count III);

violation of FCRA - Retaliation (Count IV) and invasion of privacy - misappropriation of

plaintiff's likeness (Count VI). According to the defendant:

> [the plaintiff] lacks any evidentiary support for her disability and handicap
> discrimination claims (whether for disparate treatment or retaliation), as
> she cannot demonstrate that she was treated differently because of her
> alleged disability prior to her complaint to Human Resources, nor that she
> was retaliated against after having complained to Human Resources.
> Moreover, any actions taken against her were for legitimate business
> reasons. Further, [the plaintiff] cannot substantiate her claim that any
> person at Randstad was using her image or likeness.

Defendant, Randstad Professionals US, LP's Motion for Summary Judgment and Incorporated Memorandum of Law (DE# 47 at 2, 2/6/15). The plaintiff maintains that "[t]he record in this case does not support summary judgment in any way, shape or form" because: (1) "[Mr. Leeds] made hateful remarks about [the plaintiff's] disability on consecutive days, including a day in which he sought her termination three times;" (2) "[the d]efendant's bad faith spoliation of evidence . . . has hindered [the plaintiff]'s ability to establish additional comparators and (3) with respect to Count VI, "disputed material facts relating to [the d]efendant's continued use of [the plaintiff]'s name and likeness in for [sic] [the d]efendant's commercial benefit after her termination." Plaintiff's Response in Opposition to Defendant's Motion for Summary Judgment and Incorporated Memorandum of Law (DE# 79 at 1-2, 2/23/15).

**A.   Discrimination Counts**

In the instant case, the plaintiff asserts discrimination claims under the ADA (Count I) and the FCRA (Count II). The ADA prohibits employers from "discriminat[ing] against a qualified individual on the basis of [a] disability in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment." 42 U.S.C. § 12112(a). Discrimination and retaliation claims brought under the ADA and the FCRA are analyzed in the same manner. See Rabb v. Sch. Bd. of Orange Cnty., Fla., 590 F. App'x 849, 850 n.2 (11th Cir. 2014) (per curiam) (stating that "[b]ecause disability discrimination claims under the FCRA are analyzed under the same standards as ADA claims, our reasoning with respect to [the plaintiff]'s ADA claim applies equally

to her FCRA claim"); Duble v. FedEx Ground Package Sys., Inc., 572 F. App'x 889, 895

(11th Cir. 2014) (per curiam) (stating "[w]e evaluate ADA and FCRA retaliation cases

under the framework set forth in McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802-

03, 93 S.Ct. 1817, 1824, 36 L.Ed.2d 668 (1973)."). Thus, the Court's analysis of and

rulings on the plaintiff's discrimination and retaliation claims under the ADA apply

equally to her FCRA claims.

        An ADA plaintiff may prove discrimination through direct evidence or

circumstantial evidence. See Wascura v. City of S. Miami, 257 F.3d 1238, 1242 (11th

Cir. 2001) (stating that "[i]n the absence of direct evidence of discrimination, a plaintiff

may establish a prima facie case of an ADA violation through circumstantial evidence . .

. .") (footnote omitted). The plaintiff argues that the evidence in the instant case is

sufficient to support a finding of both direct evidence of discrimination and

circumstantial evidence of discrimination. See Plaintiff's Response in Opposition to

Defendant's Motion for Summary Judgment and Incorporated Memorandum of Law

(DE# 79 at 12, 2/23/15).

        **1.      Direct Evidence of Discrimination**

        The Eleventh Circuit has stated that "[d]irect evidence of discrimination is

evidence which reflects a discriminatory or retaliatory attitude correlating to the

discrimination or retaliation complained of by the employee and that, if believed, proves

the existence of a fact without inference or presumption." Hamilton v. Southland

Christian Sch., Inc., 80 F.3d 1316, 1320 (11th Cir. 2012) (internal quotation marks and

citation omitted) (Title VII case).[23] Here, the plaintiff states that:

> Counts I and II are for disability/handicap discrimination in the form of a wrongful termination based on the discriminatory animus of [the plaintiff]'s supervisor [Mr.] Leeds. It is supported by hateful remarks made by [Mr.] Leeds on October 10, 2013 to [the plaintiff] directly about her mental health condition and more hateful remarks made the following day to HR.

Plaintiff's Response in Opposition to Defendant's Motion for Summary Judgment and

Incorporated Memorandum of Law (DE# 79 at 12, 2/23/15). To support her argument

that there was direct evidence of discrimination in the instant case, the plaintiff

summarizes the record as follows:

> On October 10, 2013, [Mr.] Leeds summoned [the plaintiff] into his office and belittled her about her mental health disabilities. [Mr.] Leeds told [the plaintiff] she needed to be on stronger medications for her mental health conditions, because the ones she was on were not working. He said that her "problems" were due to the "drugs" she was on, and that she needed more mental help. When his haranguing brought [the plaintiff] to tears, [Mr.] Leeds taunted her, calling her a cry baby and questioning whether her doctor needed to increase her drug dosage, or better yet, change her prescription, because she needed stronger medications. The very next day, in response to [Ms.] Freitas' investigation of his discriminatory comments, [Mr.] Leeds did not relent, characterizing [the plaintiff] as being "disturbed," and having "major mental issues." No sooner than he uttered these words to [Ms.] Freitas, he requested that she terminate [the plaintiff]. Though [Ms.] Freitas initially held off due to [the plaintiff]'s complaint, she and [Mr.] Albertson relented two weeks later and agreed to terminate [the plaintiff].

Id. at 13. According to the plaintiff, "[Mr.] Leeds' comments to [the plaintiff] and [Ms.]

Freitas constitute direct evidence of discrimination." Id. The plaintiff further states that:

"[Mr.] Leeds['] comments, immediately followed by his campaign to terminate [the

plaintiff], serve as direct evidence of disability discrimination." Id. at 14.

---

[23] "The burden-shifting analysis of Title VII employment discrimination claims is applicable to ADA claims." Holly v. Clairson Indus., 492 F.3d 1247, 1255 (11th Cir. 2007) (citation and internal quotation marks omitted).

The Court finds that the evidence cited by the plaintiff is not direct evidence of disability discrimination. "[C]ourts have found only the most blatant remarks, whose intent could be nothing other than to discriminate . . . to constitute direct evidence of discrimination." Carter v. City of Miami, 870 F.2d 578, 582 (11th Cir. 1989) (ADEA claim). "Direct evidence is evidence that establishes the existence of discriminatory intent behind the employment decision without any inference or presumption." Standard v. A.B.E.L. Servs., Inc., 161 F.3d 1318, 1327 (11th Cir. 1998) (citing Carter, 870 F.2d at 580-81). Because the Court would have to infer or presume discriminatory intent on the part of Mr. Leeds based on his statements, the plaintiff has not presented direct evidence of discrimination.

### 2.    Circumstantial Evidence of Discrimination

Alternatively, the plaintiff seeks to prove her discrimination case based on circumstantial evidence. If an ADA plaintiff seeks to prove his or her case through circumstantial evidence, the burden-shifting framework set forth in McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802-03 (1973) applies. See Ward v. United Parcel Serv., 580 F. App'x 735, 739-40 (11th Cir. 2014) (stating "[w]e analyze ADA discrimination claims under the McDonnell Douglas burden-shifting framework.").  Under this framework, the plaintiff must first establish a prima facie case of discrimination. To establish a prima facie case, the plaintiff must show that she: (1) was disabled, (2) was qualified to perform the job and (3) was subjected to an adverse employment action because of her disability. If the plaintiff establishes a prima facie case, the burden shifts to the defendant to proffer a legitimate, non-discriminatory reason for its actions. If the defendant makes this showing, the burden shifts back to the plaintiff to demonstrate

34

that the reason given by the defendant was a pretext for disability discrimination. Id. at 740.

### (a.)   Prima Face Case

In order to establish a prima facie case of discrimination under the ADA, the plaintiff must show that she: "(1) had, or was perceived to have, a 'disability;' (2) was a 'qualified' individual; and (3) was discriminated against because of her disability." Carruthers v. BSA Adver., Inc., 357 F.3d 1213, 1215 (11th Cir. 2004) (citing Williams v. Motorola, Inc., 303 F.3d 1284, 1290 (11th Cir. 2002)).

It is unclear whether the parties agree that the first two elements of a prima face of discrimination have been met. The plaintiff asserts that "[the d]efendant does not challenge the first two elements on summary judgment." Plaintiff's Response in Opposition to Defendant's Motion for Summary Judgment and Incorporated Memorandum of Law (DE# 79 at 13, 2/23/15). The defendant does not address this assertion in its reply. However, in its motion, the defendant does argue that "[t]he record evidence fails to support [the plaintiff]'s accusation that Randstad's management viewed her as disabled. In fact, . . . [the plaintiff] received the fullest extent of every privilege and benefit of her employment with Randstad prior to her termination resulting from her own insubordinate behavior." Defendant, Randstad Professionals US, LP's Motion for Summary Judgment and Incorporated Memorandum of Law (DE# 47 at 9, 2/6/15). Thus, it would appear that the defendant does challenge the first element of a prima facie case: that the plaintiff had, or was perceived to have, a disability under the ADA.

The ADA defines "disability" to include: "(A) a physical or mental impairment that

35

substantially limits one or more major life activities of such individual; (B) a record of such an impairment; or (C) being regarded as having such an impairment . . . ." 42 U.S.C. § 12102(1). "Under the 'regarded as having . . . an impairment' definition of disabled, an individual is considered 'disabled' if his employer perceives him as having an ADA-qualifying disability. . . . As with actual disabilities, **a perceived impairment must be believed to substantially limit a major life activity of the individual**."

Shepard v. United Parcel Serv., Inc., 470 F. App'x 726, 729 (11th Cir. 2012) (internal citations omitted; emphasis added). The Eleventh Circuit has explained that:

> Under the ADA, a physical impairment does not substantially limit the major life activity of working merely because it precludes the performance of one particular job. 29 C.F.R. § 1630.2(j)(3)(i). Instead, the impairment must significantly restrict "the ability to perform either a class of jobs or a broad range of jobs in various classes as compared to the average person having comparable training, skills and abilities."

Standard v. A.B.E.L. Servs., Inc., 161 F.3d 1318, 1327 (11th Cir. 1998). In Standard, the circuit court found that a plaintiff who "d[id] not explicitly argue that his back injury significantly restricted his ability to work" could not "be considered disabled by virtue of § 12102(2)(A) of the ADA." Id.[24]

Based on the record in the instant case, the Court is not persuaded that the plaintiff has met the first element of a prima facie case. The plaintiff points to no record evidence that she had or the defendant perceived her to have a mental impairment that substantially limited a major life activity. See Moore v. Hillsborough Cnty. Bd. of Cnty. Com'rs, 544 F. Supp. 2d 1291, 1300 (M.D. Fla. 2008) (granting summary judgment for

---

[24] Section 12102(2) of the ADA defines "major life activities" and section 12102(1) defines "disability." 42 U.S.C. § 12102(1)-(2).

employer because plaintiff failed to meet first element of <u>prima facie</u> case where "[a]lthough it [wa]s undisputed [she] suffered a knee injury in January 2004 for which she underwent surgery and was diagnosed with a neck injury in 2004, [the p]laintiff . . . presented only scarce evidence regarding her impairments and . . . failed to demonstrate that her impairments substantially limit[ed] her ability to work, walk or perform any other major life activity. ").

Here, the plaintiff started seeing a psychiatrist in the beginning of 2013. She was diagnosed with mood disorder, not otherwise specified, and was treated for depression with medication. The plaintiff also reported panic attacks, anxiety, paranoia and insomnia. Notably, the plaintiff continued to come to work and performed her job after she began psychiatric treatment and there is no evidence that the plaintiff's mental condition impaired any other major life activity. Moreover, while Mr. Leeds made statements about the plaintiff's mental state at the October 10, 2013 meeting, and possibly at other times, there is no evidence that he perceived her mental state as precluding her from performing her job.[25]

There is also no record evidence that Mr. Leeds treated the plaintiff as if she were disabled upon learning that she began seeing a psychiatrist. <u>See Moore</u>, 544 F. Supp. 2d at 1302 (stating that "[the p]laintiff's testimony that [the d]efendant never

---

[25] According to the plaintiff, Mr. Leeds told her: "I thought your mental state was a lot better this year than it was last year. You should go back to your doctor and ask for either a new medication or tell them to increase your medication," Deposition of Vanessa Militano (DE# 80-6 at 18, 2/23/15), during the October 10, 2013 meeting. Mr. Leeds also told Ms. Freitas that the plaintiff was "disturbed," had "major mental issues," had had a mental break down in 2012 and was on mental health medication, However, Mr. Leeds made no comments about his belief that the plaintiff could not do her job or that her mental state impaired a major life activity.

treated her as if she were disabled forecloses any argument that she was regarded as having a disability."). The Eleventh Circuit has stated, "[m]erely proving the existence of a[n] . . . impairment, without addressing any limitation on major life activities, is not sufficient to prove disability under the Act." Standard, 161 F.3d at 1327. Nonetheless, because the defendant does not directly address in its reply the plaintiff's assertion that the first two elements of a prima facie case are not disputed, the Court will assume the first two factors[26] are met and will proceed to address the third factor.

Under the third factor, the plaintiff must show that she was discriminated against because of her disability. See Duble, 572 F. App'x at 894 (stating that "[t]o establish the third prong, the plaintiff must show the employer discriminated against him on the basis of his disability.") (citing Holly, 492 F.3d at 1261-62). With respect to this third factor, the plaintiff cites to "[Mr.] Leed's hateful remarks" and argues that "they surely at minimum 'suggest' discrimination for purposes of proving discrimination by circumstantial evidence." Plaintiff's Response in Opposition to Defendant's Motion for Summary Judgment and Incorporated Memorandum of Law (DE# 79 at 15, 2/23/15).

---

[26] The second factor is that the plaintiff is qualified for her position. Although the defendant does not address this second factor in its motion, it is clear from the undisputed record that the plaintiff was qualified for her position as an executive recruiter. The plaintiff had been employed by the defendant for approximately three years at the time of her termination and had been recognized by the defendant for her job performance with invitations to the President's Club annual meeting and to be a speaker at two company Boot Camps for new recruiters. In the Eleventh Circuit, "plaintiffs, who have been discharged from a previously held position," do not need to satisfy the McDonnell Douglas prong requiring proof of qualification." Damon v. Fleming Supermarkets of Fla., Inc., 196 F.3d 1354, 1360 (11th Cir. 1999) (stating that "[o]ur precedent holds that if a plaintiff has enjoyed a long tenure at a certain position, we can infer that he or she is qualified to hold that particular position.") (citation and internal quotation marks omitted) (ADEA case). Thus, the second factor is unquestionably met in the instant case.

38

The defendant states that the plaintiff "cannot demonstrate that she ever was treated disparately by her coworkers or by anyone in management, let alone because of her purported disabilities." Defendant, Randstad Professionals US, LP's Motion for Summary Judgment and Incorporated Memorandum of Law (DE# 47 at 3, 2/6/15). The defendant further notes that the plaintiff "was unable at her deposition to identify any factual basis for her claim that she was discriminated against because of any alleged disability." Id.

The Court agrees with the defendant that the plaintiff cannot meet her burden of proving that she was terminated because of her actual or perceived disability. Notwithstanding Mr. Leeds' comments and conduct, the record shows that Ms. Freitas made the decision to terminate the plaintiff. The plaintiff has pointed to no record evidence of a discriminatory animus on the part of Ms. Freitas or that Ms. Freitas' decision to terminate the plaintiff was based on comments made by Mr. Leeds about the plaintiff's disability. Thus, based on this record, the plaintiff has not shown a prima facie case of employment discrimination.

### (b.)   Legitimate, Non-discriminatory Reason

Assuming, arguendo, that the plaintiff has established a prima face case of disability discrimination, the burden shifts to the defendant to proffer a legitimate, non-discriminatory reason for the plaintiff's termination. The defendant asserts that: "[the plaintiff's] conduct following her return to the office at the conclusion of the H.R. investigation into her October 11, 2013, complaint, was insubordinate and caustic, which actually caused her ultimate termination from employment." Defendant, Randstad Professionals US, LP's, Reply In Support of Motion for Summary Judgment and

39

Incorporated Memorandum of Law [ECF NO. 47] (DE# 91 at 9, 3/5/15).[27] The Eleventh

Circuit has stated that the burden of articulating a legitimate, non-discriminatory reason

"is 'exceedingly light'; the defendant is only required to proffer those "reasons, not prove

them." Meeks v. Computer Assocs. Int'l, 15 F.3d 1013, 1019 (11th Cir. 1994) (Title VII

claim). Therefore, the defendant has met its burden in the instant case.

> **(c.)    Pretext**

Having determined that the defendant has met its burden of asserting a

legitimate, non-discriminatory reason for terminating the plaintiff's employment, the

burden shifts to the plaintiff to show pretext. The plaintiff argues that she has shown

---

[27] In its motion, the defendant had initially asserted three reasons for the plaintiff's termination: "insubordination, belligerence, and attendance issues following her return [to work]." Defendant, Randstad Professionals US, LP's Motion for Summary Judgment and Incorporated Memorandum of Law (DE# 47 at 13-14, 2/6/15). However, in its reply, the defendant stated that attendance was not a reason for the plaintiff's termination:

> The plaintiff ultimately was terminated because of her belligerent behavior after her return to the office. In addition, **while not the catalyst to her termination**, Mr. Leeds discovered that Plaintiff had departed at approximately 4:45 p.m. on one day upon her return, despite having been asked to resume her previous schedule of arriving by 10:00 [a.m.]
>
> ***
>
> **Though [the p]laintiff's attendance in the office had been a performance issue (particularly given missed candidate interviews), she was never disciplined for same (before or after her complaint to Human Resources) and the termination of Plaintiff's employment resulted directly from the extreme insubordinate and disrespectful behavior** that she displayed upon her return to the office after October 16, 2013.

Defendant, Randstad Professionals US, LP's, Reply In Support of Motion for Summary Judgment and Incorporated Memorandum of Law [ECF NO. 47] (DE# 91 at 6-7, 3/5/15) (emphasis added). Thus, the defendant is no longer citing attendance issues as a reason for terminating the plaintiff and the Court will deem that reason abandoned.

pretext because:

> [Mr.] Leeds made hateful remarks about [the plaintiff]'s disability on
> consecutive days in October of 2013. On the second of those days, he
> made three separate attempts to have her terminated, and made several
> more attempts in the two weeks that followed until he finally got approval
> for her termination on October 25, 2013. Those facts alone are sufficient
> to permit a fact finder to conclude that [the d]efendant's purported bases
> for terminating [the plaintiff] were pretextual.

Plaintiff's Response in Opposition to Defendant's Motion for Summary Judgment and

Incorporated Memorandum of Law (DE# 79 at 16, 2/23/15).

The problem with the plaintiff's argument is that she focuses on Mr. Leed's

statements and conduct when the record evidence shows that it was Ms. Freitas who

made the decision to terminate the plaintiff. See Deposition of Jonathan Leeds (DE#

92-2 at 18, 3/5/15).[28] Mr. Leeds' actions and statements are not evidence of a

discriminatory animus on the part of Ms. Freitas, the actual decisionmaker, in the

instant case. While Mr. Leeds had the authority to fire the plaintiff and the record shows

he certainly wanted to, he did not take it upon himself to do so. Id. at 17-18. The record

evidence is that Ms. Freitas fired the plaintiff. Id. Ms. Freitas conducted her own H.R.

investigation, she had first-hand interactions with the plaintiff, was informed by Mr.

Leeds, the plaintiff and other employees of Randstad including an IT representative

about the issues in the Miami Office following the plaintiff's October 16, 2013 return to

work and did not merely "rubber stamp" Mr. Leeds' multiple requests to terminate the

---

[28] To the extent the plaintiff is seeking to proceed under a "cat's paw" theory,
where a decisionmaker who has no discriminatory animus is influenced by a
subordinate who *is* motivated by discriminatory animus, the facts of this case do not
support such a theory for the reasons discussed in the Court's analysis of the plaintiff's
retaliation claims. See discussion, infra.

plaintiff. Because there is no record evidence of a discriminatory animus on the part of Ms. Freitas, the plaintiff cannot establish pretext. "[A] reason cannot be proved to be a pretext for discrimination unless it is shown both that the reason was false, and that discrimination was the real reason." St. Mary's Honor Ctr. v. Hicks, 509 U.S. 502, 515 (1993).

As further evidence of disability discrimination, the plaintiff argues that: "the record is replete with evidence that [Mr.] Leeds treated [the plaintiff]'s non-disabled coworkers more favorably in response to insubordinate behavior. Elizabeth Ramos, Chris Rallo and Angie Garcia all get drunk on company time, and still have a job." Id. The plaintiff also notes that Ms. Ramos is still employed by the defendant even though she brought adult toys to an office function and spoke openly at work about her romantic escapades. Id.

The defendant responds that the unprofessional conduct of the plaintiff's non-disabled co-workers is immaterial "to the determination of whether Mr. Leeds possessed any discriminatory animus directed at [the p]laintiff's alleged disability." Defendant, Randstad Professionals US, LP's, Reply In Support of Motion for Summary Judgment and Incorporated Memorandum of Law [ECF NO. 47] (DE# 91 at 3, 3/5/15). The defendant argues that the plaintiff has proffered no evidence that Mr. Leeds knew about the inappropriate behavior of those employees. Id.[29] The defendant also argues

---

[29] The plaintiff filed a declaration in opposition to the instant summary judgment motion attesting that Mr. Leeds knew about her co-worker's drunkenness, the adult toys and Ms. Ramos' "lewd discussions." Declaration of Vanessa Militano (DE# 79-20, 2/23/15). As noted earlier, the Court accepts this factual statement as true for summary judgment purposes.

that the conduct of these employees is different from the plaintiff's conduct of "personal attacks to her manager upon her return to the office." Id. In sum, the defendant argues that there are no comparators in this case because the plaintiff cannot cite to any executive recruiters in the Miami Office who exhibited "extreme insubordinat[ion] and disrespectful behavior." Id. at 7.

"When the proffered legitimate, nondiscriminatory reason is [a] plaintiff's violation of a work rule, [the Eleventh Circuit has] held that the 'work rule' defense may be pretextual when a plaintiff submits evidence . . . that if he did violate the rule, other employees outside the protected class, who engaged in **similar acts**, were treated differently." Lopez v. AT&T Corp., 457 F. App'x 872, 875 (11th Cir. 2012) (emphasis added); see also Word v. AT&T, 576 F. App'x 908, 914 (11th Cir. 2014) (per curiam) (stating that "[i]n the disciplinary context, [the Court] consider[s] whether the employees were accused of the **same or similar conduct** and were disciplined in different ways.") (Title VII and § 1981 case) (emphasis added)).

In the instant case, the conduct which the defendant has cited as grounds for terminating the plaintiff (insubordination) is very different from the conduct engaged in by Ms. Ramos, Mr. Rallo and Ms. Garcia (drunkenness, adult toys and lewd conversations). Thus, the Court concludes that these three co-workers are not comparators and the plaintiff has failed to show pretext. See Word, 576 F. App'x at 915 (stating that where the plaintiff is "not similarly situated to her comparators in all relevant respects, no reasonable jury could find that the differences surrounding their [preferential treatment] showed discrimination.").

For the reasons stated herein, the Court concludes that the plaintiff has not met

43

her burden to show pretext.

Alternatively, the plaintiff has not shown "a convincing mosaic of circumstantial evidence" of discriminatory intent. See Ward v. United Parcel Serv., 580 F. App'x 735, 740 (11th Cir. 2014). The Eleventh Circuit has:

> cautioned that establishing the elements of the McDonnell Douglas framework is not, and never was intended to be, the sine qua non for a plaintiff to survive summary judgment in an employment discrimination case. A plaintiff also may defeat a summary judgment motion by presenting a convincing mosaic of circumstantial evidence that would allow a jury to infer intentional discrimination by the decisionmaker.

Id. (internal citation and quotation marks omitted). Because Mr. Leeds was not the person who terminated the plaintiff and there is no evidence that Ms. Freitas simply "rubber stamped" his requests that the plaintiff be fired, the plaintiff has not shown any evidence, much less "a convincing mosaic of circumstantial evidence" of discriminatory intent by Ms. Freitas.

In sum, the plaintiff cannot establish a prima facie case of discrimination (assuming the defendant concedes the first factor) because the plaintiff cannot show that her termination was motivated by discriminatory animus. Alternatively, even if, arguendo, the plaintiff has set forth a prima facie case of discrimination, the plaintiff has failed to show pretext. Accordingly, the defendant is entitled to summary judgment on the plaintiff's federal and state law discrimination claims.

## B.    Retaliation Counts

The plaintiff also asserts retaliation claims under the ADA (Count III) and the FCRA (Count IV). The ADA states that "[n]o person shall discriminate against any individual because such individual has opposed any act or practice made unlawful by

44

this chapter or because such individual made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this chapter." 42 U.S.C. § 12203(a). Retaliation under the ADA may be proved through direct or circumstantial evidence. See Dickey v. Dollar Gen. Corp., 351 F. App'x 389, 392 (11th Cir. 2009) (stating that "[a] plaintiff can establish a retaliation claim through either direct or circumstantial evidence").

### 1.    Direct Evidence of Retaliation

It is unclear from the plaintiff's response whether she is seeking to establish her retaliation claim through direct evidence. To that extent, the Court finds that the record evidence is insufficient to constitute direct evidence of retaliation. In Dickey v. Dollar Gen. Corp., 351 F. App'x 389, 392 (11th Cir. 2009), the Eleventh Circuit reversed an order granting summary judgment for an employer on a plaintiff's retaliation claim because the plaintiff had presented direct evidence of retaliation. In Dickey, the plaintiff presented evidence that a "district manager expressly informed her in a phone call that she was terminated, **in part, because she had filed a claim with the [Florida Commission on Human Relations]**." Id. (emphasis added). The Eleventh Circuit concluded that "[t]his proffer constitute[d] direct evidence because finding a retaliatory motive based on this statement requires no inference or presumption." Here, the plaintiff was never told that she was being terminated because she had complained to H.R. Thus, none of the statements made by Mr. Leeds or Ms. Freitas in the instant case constitute direct evidence of a retaliatory motive.

### 2.    Circumstantial Evidence of Retaliation

Where the plaintiff does not present any direct evidence of retaliatory discharge,

45

circumstantial evidence may be evaluated under a burden-shifting framework. See Woodruff v. Sch. Bd. of Seminole Cnty, Fla., 304 F. App'x 795, 797-98 (11th Cir. 2008) (applying burden-shifting framework to ADA retaliation claim). Under this framework, the plaintiff must first establish a prima facie case of retaliation. Id. at 797. The employer must then articulate a legitimate, non-retaliatory reason for the challenged action. Id. at 798. If the employer meets its burden, the plaintiff must show pretext. Id.

### (a.)   **Prima Face Case**

"To establish a prima facie case for retaliation under the ADA, the plaintiff must show '(1) he engaged in a statutorily protected expression; (2) he suffered an adverse employment action; and (3) there was a causal link between the adverse action and his protected expression.'" Duble, 572 F. App'x at 895 (quoting Lucas v. W.W. Grainger, Inc., 257 F.3d 1249, 1260 (11th Cir. 2001)).

At the outset, the Court finds that the record supports the first two prongs of a prima facie case of retaliation. The defendant does not dispute that the plaintiff engaged in a statutorily protected activity when she complained to H.R. on October 11, 2013 about Mr. Leeds. The plaintiff has also shown that she suffered an adverse employment action: the termination of her employment.

To the extent the plaintiff seeks to rely on Mr. Leeds' imposition of written Office Guidelines on the plaintiff, the Court finds that this action did not constitute an adverse employment action. The Eleventh Circuit has explained that:

> Regarding an adverse action, a plaintiff must show that a reasonable employee would have found the challenged action materially adverse. The acts must be material and significant and not trivial. In addition, a materially adverse action is one that well might have dissuaded a reasonable worker from making or supporting a charge of discrimination.

Further, the significance of any given act of retaliation will often depend upon the particular circumstances. Context matters.

Tarmas v. Sec'y of Navy, 433 F. App'x 754, 762-63 (11th Cir. 2011) (internal citations, internal quotation marks and footnote omitted) (per curiam) (finding that under the facts of that case "there was nothing retaliatory about a supervisor notifying an employee of problems with his work."); see also Lucas v. W.W. Grainger, Inc., 257 F.3d 1249, 1261 (11th Cir. 2001) (stating that "[n]egative performance evaluations, standing alone, do not constitute adverse employment action sufficient to satisfy the second element of a prima facie case of retaliation under the ADA."); Swindle v. Jefferson Cnty Comm'n, 593 F. App'x 919, 927 (11th Cir. 2014) (per curiam) (stating that "[n]ormally petty slights, minor annoyances, and simple lack of good manners are not likely to deter a victim of discrimination from complaining to the EEOC and thus do not constitute retaliation.") (citation and internal quotation marks omitted).

The Court also finds that Mr. Leeds' unsuccessful attempts to terminate the plaintiff's employment were not adverse employment actions. "An adverse employment action is any act by the employer that dissuades a reasonable employee from engaging in the protected activity." Santandreu v. Miami Dade Cnty, 513 F. App'x 902, 906 (11th Cir. 2013) (per curiam) (citing Burlington N. & Santa Fe Ry. Co. v. White, 548 U.S. 53, 68 (2006)). In Branscomb v. U.S. Dep't. of the Navy, 556 F. App'x 910, 910-11 (11th Cir. 2014), the plaintiff cited two letters written "to the Office of Worker's Compensation Programs that contested [the plaintiff]'s application for benefits . . . and that reported the decision . . . affirming [the plaintiff]'s termination and requested cessation of [the plaintiff]'s benefits . . . ." The Eleventh Circuit stated that neither letter "constituted an

47

adverse employment action because they did not result in some tangible, negative effect on [the plaintiff]'s receipt of worker's compensation benefits." Id. at 911. Here, Mr. Leeds sought the plaintiff's termination multiple times. However, he did not actually terminate the plaintiff. Moreover, the plaintiff's conduct commencing upon her return to the Miami Office on October 16, 2013 was an intervening factor between the plaintiff's October 11, 2013 complaint to H.R. about Mr. Leeds and her termination. See Henderson v. FedEx Express, 442 F. App'x 502, 506 (11th Cir. 2011) (stating that "[i]ntervening acts of misconduct can break any causal link between the protected conduct and the adverse employment action.") (per curiam) (Title VII case). Thus, the only adverse action in the instant case is the plaintiff's termination from employment on October 28, 2013.[30]

Having addressed the first and second prong, the Court now turns to the third prong of a prima facie case of retaliation: whether the decision to terminate the plaintiff was causally related to her H.R. complaint about Mr. Leeds.

In support of causation, the plaintiff argues that her:

ultimate burden on causation is that her protected activity was the "but-for" cause of the adverse action. [The d]efendant does not dispute that [the plaintiff] engaged in protected activity on October 11, 2013, that the

_____

[30] The Amended Complaint (DE# 1-2 at 23, 4/10/14) contains additional examples of adverse actions taken against the plaintiff in retaliation for her H.R. complaint. Because the plaintiff did not raise them in opposition to the instant summary judgment motion, the Court will consider those purported adverse actions abandoned. See Odom v. Citigroup Global Mkts., Inc., No. 3:11-cv-75-RS-EMT, 2014 WL 6610069, at *13, n.1 (N.D. Fla. Nov. 20, 2014) (finding that a plaintiff who made an allegation of protected activity in his amended complaint but did not continue to assert this allegation in his response in opposition to the defendant's summary judgment motion was deemed to have abandoned the allegation).

decision to terminate her was made on October 25, 2013, or that she was actually terminated on October 28, 2013. In terms of causation, the facts speak for themselves.

Plaintiff's Response in Opposition to Defendant's Motion for Summary Judgment and Incorporated Memorandum of Law (DE# 79 at 17, 2/23/15) (footnotes omitted). The plaintiff further argues that: "After nearly three years of supervising her, the first time [Mr.] Leeds ever sought to fire [the plaintiff] was the day she engaged in protected activity-three times within a few hours of learning of the protected activity." Id. at 17.

The Eleventh Circuit has stated that "[t]emporal proximity alone is insufficient to establish a causal connection **in the absence of actual knowledge by the employer**." Jarvela v. Crete Carrier Corp., 776 F.3d 822, 832 (11th Cir. 2015) (FMLA case) (emphasis added). Along these lines, the defendant argues that Mr. Leeds did not know about the plaintiff's complaint to H.R. on the day she made it:

> [the p]laintiff's cryptic message [to Mr. Leeds] that she was working from home while "the issue" was being resolved by Human Resources, gave no indication that [the p]laintiff had raised a complaint against him. Thus, Mr. Leeds could not have been motivated to retaliate against [the p]laintiff at that time.

Defendant, Randstad Professionals US, LP's, Reply In Support of Motion for Summary Judgment and Incorporated Memorandum of Law [ECF NO. 47] (DE# 91 at 9, 3/5/15).

The defendant's argument is not supported by the record. Even if the plaintiff's "cryptic message" was not enough to put Mr. Leeds on notice of her complaint to H.R., he spoke to Ms. Freitas on October 11, 2013 (the same day the plaintiff lodged her complaint) and they discussed the plaintiff's complaint about him. See Deposition of

Tina Freitas (DE# 80-2 at 11-12, 2/23/15).[31] Therefore, Mr. Leeds knew the plaintiff had complained to H.R. about him on October 11, 2013. More importantly, the ultimate decisionmaker in the instant case was Ms. Freitas and Ms. Freitas knew about the plaintiff's H.R. complaint because she was the person the plaintiff complained to.

The Eleventh Circuit has "indicated that the requirement of causation in a retaliation case is to be interpreted broadly; that is, the plaintiff 'merely has to prove that the protected activity and the negative employment action are not completely unrelated.'" Gary v. Hale, 212 F. App'x 952, 957 (11th Cir. 2007) (quoting Meeks, 15 F.3d at 1021). Under Eleventh Circuit precedent, a plaintiff satisfies causation by providing sufficient evidence that the decisionmaker had knowledge of the protected activity and that there was a close temporal proximity between this awareness and the adverse action. Higdon v. Jackson, 393 F.3d 1211, 1220 (11th Cir. 2004); see also Brungart v. BellSouth Telecomms., Inc., 231 F.3d 791, 799 (11th Cir. 2000) (stating that "the general rule is that close temporal proximity between the employee's protected

---

[31] Concerning her conversation with Mr. Leeds on October 11, 2013, Ms. Freitas testified as follows:

> Q. And when you reached Mr. Leeds, you had your - - at that time you had your investigative discussion with him during your initial call with him?
>
> [Counsel for the defendant]: Objection as to form.
>
> A. I had -- yes.
>
> **Q. You made it clear during that call that [the plaintiff] had complained to you about an incident that occurred the prior day?**
>
> **A. Yes.**

Deposition of Tina Freitas (DE# 80-2 at 11-12, 2/23/15) (emphasis added).

conduct and the adverse employment action is sufficient circumstantial evidence to create a genuine issue of material fact of a causal connection."). On the other hand, "[i]f there is a substantial delay between the protected expression and the adverse action[,] in the absence of other evidence tending to show causation, the complaint of retaliation fails as a matter of law." Id. at 1220-21.

The Eleventh Circuit has also stated that "[i]ntervening acts of misconduct can break any causal link between the protected conduct and the adverse employment action." Henderson, 442 F. App'x at 506. Here, the plaintiff complained to H.R. on October 11, 2013. She returned to work on October 16, 2013 and engaged in conduct which Ms. Freitas deemed to be insubordinate. Thus, the causal link between the plaintiff's protected act and her termination was broken by her conduct in the weeks preceding her termination and the plaintiff cannot establish causation.

Alternatively, the Court finds that the plaintiff has met the causation prong of a prima facie case of retaliation. The Eleventh Circuit has "repeatedly indicated that a plaintiff may satisfy the causal link in a retaliation case by establishing that the employer was actually aware of the protected expression at the time it took the adverse employment action." Gary, 212 F. App'x at 957 (citation and internal quotation marks omitted). Here, the plaintiff complained to Ms. Freitas on October 11, 2013 and was terminated by Ms. Freitas just 17 days later on October 28, 2013. Ms. Freitas' decision to terminate the plaintiff occurred even earlier on October 25, 2013. Thus, alternatively, the plaintiff has shown that her termination was causally related to her H.R. complaint. See Donnellon v. Fruehauf Corp., 794 F.2d 598, 601 (11th Cir. 1986) (stating that "[t]he short period of time [one month] . . . between the filing of the discrimination complaint

51

and the plaintiff's discharge belies any assertion by the defendant that the plaintiff failed to prove causation."); Hurlbert v. St. Mary's Health Care Sys., Inc., 439 F.3d 1286, 1298 (11th Cir. 2006) (stating that "[c]lose temporal proximity between protected conduct and an adverse employment action is generally sufficient circumstantial evidence to create a genuine issue of material fact of a causal connection.") (citation and internal quotation marks omitted).

### (b.)   Legitimate, Non-Retaliatory Reason

Having determined, alternatively, that the plaintiff has established a prima facie case for retaliation, the burden shifts to the defendant to articulate a legitimate nonretaliatory reason for the plaintiff's termination. As noted above, the defendant has asserted that the plaintiff's belligerence and insubordination following her return to work after the conclusion of the H.R. investigation caused her termination.

### (c.)   Pretext

Because the defendant has proffered a legitimate, non-retaliatory reason for the termination, the plaintiff must show pretext. A plaintiff may show pretext by "either directly persuading the court that a [retaliatory] reason was more likely what motivated the employer or indirectly showing that the employer's proffered explanation is unworthy of credence." Jackson v. Ala. State Tenure Comm'n, 405 F.3d 1276, 1289 (11th Cir. 2005).  "[T]he plaintiff must rebut each of the reasons [proffered by her employer] to survive a summary judgment motion." Archie v. Frank Cockrell Body Shop, Inc., 581 F. App'x 795, 798-799 (11th Cir. 2014).

As evidence of pretext, the plaintiff notes that:

[the d]efendant, particularly in its Miami Office, simply has no track record

52

> for terminating employees based on behavioral insubordination. As
> discussed above, multiple recruiters in the office get drunk on the job
> without repercussion. One in particular, Elizabeth Ramos, who is a lesser
> producer than [the plaintiff], brought sex toys to the office, toys that were
> later thrown about the office during working hours.

Plaintiff's Response in Opposition to Defendant's Motion for Summary Judgment and Incorporated Memorandum of Law (DE# 79 at 18-19, 2/23/15). For the reasons discussed above, the Court finds that the reasons provided for terminating the plaintiff (insubordination and belligerence) are not similar to the conduct of the other employees who were not terminated for drunkenness during work hours, bringing adult toys to the office or engaging in lewd conversations. There is no record evidence that any of these employees were insubordinate or belligerent.

The plaintiff also argues that: "A jury could reasonably determine that allegations such as being rude to an IT representative was not the real reason for [the plaintiff]'s termination when more egregious acts by non-complaining recruiters regularly go unpunished." This is not enough to create a genuine issue of material fact on summary judgment. In order to establish pretext, the plaintiff must show:

> evidence sufficient to permit a reasonable factfinder to conclude that the
> reasons given by the employer were not the real reasons for the adverse
> employment decision. In so doing, **the plaintiff may not** recast the
> reason, **attempt to substitute his business judgment for that of the
> employer, or simply quarrel[ ] with the wisdom of that reason,
> assuming the reason is one that might motivate a reasonable
> employer**.

Proe v. Facts Sevs., Inc., 491 F. App'x 135, 137 (11th Cir. 2012) (brackets in original; emphasis added; quotation marks and internal citations omitted).

The plaintiff cannot create a genuine issue of material fact, by simply arguing that a jury could determine that being rude to an IT representative (Rhonda Reid) was

not the true motivating factor because other employees engaging in dissimilar conduct

(inebriation at work, inappropriate discussions, and bringing adult toys to work) were not

disciplined. "A 'new level of specificity' applies to the inquiry at this step, in which the

plaintiff must demonstrate 'such weaknesses, implausibilities, inconsistencies,

incoherencies, or contradictions in the employer's proffered legitimate reasons for its

action that a reasonable factfinder could find them unworthy of credence." Archie, 581

F. App'x at 799 (quoting Rioux v. City of Atlanta, Ga., 520 F.3d 1269, 1275 (11th Cir.

2008). The plaintiff has not made this showing. Instead, she speculates that a jury

might not find this reason credible because other employees who engaged in dissimilar

conduct were not punished. The Eleventh Circuit has stated that: "[a] reason is not

pretext for discrimination unless it is shown both that the reason was false, and that

discrimination was the real reason." Brooks v. Cnty. Comm'n of Jefferson Cnty., Ala.,

446 F.3d 1160, 1163 (11th Cir. 2006) (citation and internal quotation marks omitted).

With respect to this proffered reason for termination, the plaintiff has shown neither.

The plaintiff also argues that:

Alternatively, a factfinder could determine that, based on all the evidence,
retaliatory reasons more likely caused [the plaintiff]'s termination than [the
d]efendant's proffered reasons. . . . the contrast between [Mr.] Leeds'
treatment of [the plaintiff] before and after October 11th at 11:59 a.m. is
staggering. Alleged chronic tardiness never warranted a write-up before
October 11th. Alleged excessive absences never warranted a write-up
before October 11th. Alleged excessive missed meetings never warranted
a write-up before October 11th. Alleged insufficient hours worked never
warranted a write-up before October 11th. Allegations of instigating
infighting with co-workers never warranted a write-up before October 11th.
Two weeks prior to October 11th, [the d]efendant could have chosen any
of the approximately 15 recruiters from the Miami Office to speak to its
new employees. It chose [the plaintiff]. [The plaintiff] went from the model
employee with an unblemished record for three years to terminated in two
weeks.

54

Id. at 19.

The Court is unpersuaded that Mr. Leeds' conduct shows pretext. The record evidence in this case is that *Ms. Freitas* decided to terminate the plaintiff. The evidence shows that Mr. Leeds made several unsuccessful appeals to Ms. Freitas and Mr. Albertson to terminate the plaintiff. However, it is also clear from the record evidence that he did not take this action upon himself and instead sought the plaintiff's termination through Ms. Freitas and/or Mr. Albertson.

At the time of the plaintiff's termination, Ms. Freitas knew that the plaintiff had had altercations with other employees in the Miami Office based on her previous interviews of the Miami Office employees during her investigation of the plaintiff's October 11, 2013 complaint. Ms. Freitas also had first-hand interactions with the plaintiff in the weeks preceding the plaintiff's termination and was a witness to her demeanor. Ms. Freitas also knew that upon the plaintiff's return to work following the H.R. investigation, the plaintiff had been rude to an IT employee (Rhonda Reid) and that the plaintiff had made a remark during Mr. Leeds' presentation at a Hot Jobs meeting.[32] Mr. Leeds forwarded to Ms. Freitas the plaintiff's emails to him during this period, including the email wherein the plaintiff acknowledged making a comment during the Hot Jobs meeting. These grounds were sufficient to support Ms. Freitas' grounds for terminating the plaintiff and the plaintiff has failed to show any retaliatory animus on the part of Ms. Freitas, the ultimate decision maker in the instant case.

---

[32] The plaintiff disputes that she walked out of this meeting, that her comment was directed to Mr. Leeds or that she used an expletive. See Declaration of Vanessa Militano (DE# 80-20 at 2, ¶6, 2/23/15). As noted earlier, the Court accepts the plaintiff's version of these events for summary judgment purposes.

To the extent the plaintiff is seeking to prove her retaliation claims through a "cat's paw" theory, the record evidence does not support this argument. Under a cat's paw theory, "causation may be proven if the plaintiff shows the decisionmaker followed an illegally-biased recommendation without independently investigating the reasoning behind it." Hanford v. Geo Grp., Inc., 345 F. App'x 339, 406 (11th Cir. 2009). Here, even if Mr. Leeds made requests to fire the plaintiff for retaliatory reasons, there is no evidence that Ms. Freitas "rubber stamped" his request. To the contrary,  Ms. Freitas conducted her own investigation. She interviewed employees in the Miami Office herself as part of the October 11, 2013 complaint investigation, she spoke to the plaintiff and Mr. Leeds multiple times, reviewed emails from the plaintiff and Mr. Leeds and received a direct complaint from an IT employee (Rhonda Reed) about the plaintiff's behavior. The record shows that Ms. Freitas was well-versed in the on-going troubles in the Miami Office and did not simply act as a conduit for Mr. Leeds' purported retaliation against the plaintiff. Thus, this is not a cat's paw case.

For the reasons stated above, the Court finds that the plaintiff has failed to show pretext. The Eleventh Circuit has:

> repeatedly and emphatically held that a defendant may terminate an employee for a good or bad reason without violating federal law. [The Court is] not in the business of adjudging whether employment decisions are prudent or fair. Instead, [its] sole concern is whether unlawful discriminatory animus motivates a challenged employment decision.

Wascura v. City of S. Miami, 257 F.3d 1238, 1247 (11th Cir. 2001) (citation omitted).

## C.   Alleged Spoliation of the Evidence

Moreover, the plaintiff's claim of spoliation does not preclude summary judgment for the defendant on the plaintiff's discrimination and retaliation claims because the

destroyed evidence relates only to the plaintiff's alleged attendance issues. The Court has already found that the defendant has abandoned this ground as a reason for terminating the plaintiff. <u>See</u> discussion, <u>supra</u>. Because the destroyed evidence does not relate to the other reasons proffered by the defendant for the plaintiff's termination, the plaintiff's spoliation claim does not preclude the entry of summary judgment in the defendant's favor on both the discrimination and retaliation claims.

**D.     Invasion of Privacy/Misappropriation of Plaintiff's Likeness**

The defendant also seeks summary judgment in its favor on the plaintiff's state law claim of invasion of privacy/misappropriation of plaintiff's likeness (Count VI). In her Amended Complaint, the plaintiff asserts a claim under section 540.08 of the Florida Statutes. <u>See</u> Amended Complaint (DE# 1-2 at 25-26, 4/10/14). Section 540.08 states in pertinent part: "No person shall publish, print, display or otherwise publicly use for purposes of trade or for any commercial or advertising purpose the name, portrait, photograph, or other likeness of any natural person without the express written or oral consent to such use . . . ." Fla. Stat. § 540.08.  "[T]he purpose of section 540.08 is to prevent the use of a person's name or likeness to directly promote a product or service because of the way that the use associates the person's name or personality with something else." <u>Tyne v. Time Warner Entm't Co., L.P.</u>, 901 So. 2d 802, 808 (Fla. 2005). As the Eleventh Circuit observed, "[c]ourts have interpreted the statute's commercial purpose requirement to require that a defendant's unauthorized use 'directly promote' a product or service." <u>Almeida v. Amazon.com</u>, 456 F.3d 1316, 1325 (11th Cir. 2006) (citations omitted).

The plaintiff maintains that there are "disputed material facts relating to [the

d]efendant's continued use of [the plaintiff]'s name and likeness in for [sic] [the d]efendant's commercial benefit after her termination." Plaintiff's Response in Opposition to Defendant's Motion for Summary Judgment and Incorporated Memorandum of Law (DE# 79 at 2, 2/23/15). The plaintiff only cites to two documents to support her claim of invasion of privacy/misappropriation of plaintiff's likeness (Count VI). See Plaintiff's Response in Opposition to Defendant's Motion for Summary Judgment and Incorporated Memorandum of Law (DE# 79 at 8, 2/23/15) (citing to Plaintiff's Exhibit W and Plaintiff's Exhibit X).

The first document (Plaintiff's Exhibit X) is an email chain totaling three emails. The first email was sent on November 14, 2013 at 10:18 a.m. by a woman named "Angie Ferrer" from an outside company to the plaintiff's work email address with the defendant. See Plaintiff's Exhibit X (DE# 79-24 at 2-3, 2/23/15). The subject line states "Feedback on Candidates" and discusses Ms. Ferrer's desire to obtain new job applicants for a position with her company. Id. The second email was sent on November 14, 2013 at 4:05 p.m. and forwards Ms. Ferrer's email from earlier that day. Id. at 1. The sender of the email is listed as the plaintiff and the recipient is Mr. Leeds. The email is signed "Vanessa Militano" with the title "Senior Executive Recruiter" under her name. One minute later a second email was sent. Id. The sender of that email is Mr. Leeds and the recipients are Mr. Albertson and Ms. Freitas. The content of the email reads: "Last email was from me." Id. There is no evidence that Mr. Leeds responded to Ms. Ferrer either using the plaintiff's email address or through his own email address posing as the plaintiff.

The second document which the plaintiff cites to support this claim is her

58

response to one of the defendant's interrogatories (Plaintiff's Exhibit W). The relevant

portion of the plaintiff's interrogatory response states as follows:

> While still employed with Randstad, I went on the company intranet to check on the status of my attempts to change my password. My IT request caused a "ticket" to be created, and the notes on the ticket were readily accessible. I printed off all of the notes in the ticket, which included some e-mails. To my knowledge, the single e-mail to which Windy Catino was a party has been produced.
>
> With regard to the events following my termination, **I was performing a Google search to seek new employment. Among the search results included my likeness associated with Randstad**. When I clicked on it, because my iPad still had my prior passwords saved, and because apparently my password on my work gmail account was not changed, I was automatically logged into my account. **Without opening any correspondence, I saw activity on my prior work e-mail account**. I contacted my attorneys at this point and on their counsel, did not open or forward any of the e-mails.

Plaintiff's Exhibit W (DE# 79-23 at 2, 2/23/15) (footnote omitted; emphasis added). Of

note, the plaintiff's interrogatory response states that she saw "activity," but she also

acknowledges that she did not open any of her email correspondence.

In her response to the defendant's summary judgment, the plaintiff argues that

"[the d]efendant used the accounts to communicate with clients as if [the plaintiff] was

communicating with them, exploiting [the plaintiff]'s relationship with them to promote

its services." Plaintiff's Response in Opposition to Defendant's Motion for Summary

Judgment and Incorporated Memorandum of Law (DE# 79 at 20, 2/23/15). However,

she cites no evidentiary support for this argument. While the plaintiff saw "activity" on

her former work email after her termination, she admitted that she did not open any of

those emails. Thus, she has no personal knowledge about whether the defendant was

using her old work email to communicate with clients.

59

The plaintiff cites to no other record evidence that Mr. Leeds or anyone else at the Randstad used the plaintiff's work email address to communicate with clients after her termination. Exhibit X shows that Mr. Leeds forwarded an email to himself from the plaintiff's work email address and then immediately claimed authorship of the email when <u>one minute later</u>, he said "Last email was from me." Plaintiff's Exhibit X (DE# 79-24 at 1, 2/23/15). More importantly, this email was sent to Mr. Albertson and Ms. Freitas, employees of Randstad, not outside clients.

The Google search results described in the plaintiff's interrogatory response are also not evidence that the defendant was promoting its services using the plaintiff's name or likeness. In <u>Faulkner Press, L.L.C. v. Class Notes, L.L.C.</u>, 756 F. Supp. 2d 1352, 1360 (N.D. Fla. 2010), the district court granted summary judgment on a section 540.08 claim where "[the defendant] published note packages for [the defendant]'s courses and used [the plaintiff's] name to identify the courses" because "[f]rom the defendant's] use, no reasonable inference [could] be drawn that [the plaintiff] was actually promoting or endorsing the notes or that [the defendant] used [the plaintiff]'s name to give that impression." The court concluded that based on this evidence, "[n]o reasonable jury could find that [the defendant] used [the plaintiff]'s name or likeness to promote its product or service." <u>Id.</u> The evidence of the Google search results in the instant case is even less compelling than the evidence in <u>Faulkner Press</u>.

The plaintiff's claim of invasion of privacy/misappropriation of plaintiff's likeness is unsupported by the record evidence and the defendant is entitled to summary judgment in its favor on this count.

60

## <u>CONCLUSION</u>

For the reasons stated herein, it is

ORDERED AND ADJUDGED that the Defendant, Randstad Professionals US,

LP's Motion for Summary Judgment and Incorporated Memorandum of Law (DE# 47,

2/6/15) is **GRANTED**.

DONE AND ORDERED in Chambers at Miami, Florida, this **13th** day of April,

2015.

_____
JOHN J. O'SULLIVAN
UNITED STATES MAGISTRATE JUDGE

Copies provided to:
All counsel on record