UNITED STATES DISTRICT COURT FOR THE
SOUTHERN DISTRICT OF FLORIDA
MIAMI DIVISION

CASE NO. 14-cv-21285-O'SULLIVAN

VANESSA MILITANO, an
Individual,

      Plaintiff,

vs.

RANDSTAD PROFESSIONALS US, LP, a
Delaware Corporation,

      Defendant.
_____/

## PLAINTIFF'S MOTION FOR RECONSIDERATION OF ORDER GRANTING SUMMARY JUDGMENT FOR DEFENDANT

Plaintiff, Vanessa Militano ("Militano"), pursuant to Federal Rule of Civil Procedure 59(e), hereby moves for reconsideration of the Court's April 13, 2015 Order Granting Summary Judgment for Defendant Randstad Professionals US, LP. ("Randstad") [D.E. 134].

### I. Introduction

Reconsideration of summary judgment for Defendant is warranted because the Court committed a manifest error of fact in concluding that Plaintiff's former supervisor Jonathan Leeds was not involved in the decision to terminate her. This conclusion, which was not advanced in Defendant's summary judgment papers, led the Court to disregard Leeds' extensive discriminatory and retaliatory conduct which directly caused Plaintiff's termination and damages. Significant evidence in the record, including Defendant's sworn Interrogatory response, confirms that Leeds was directly involved in the decision to terminate Plaintiff.

Accepting Plaintiff's disputed fact allegations as true, a jury easily could conclude that her termination was based the result of discrimination or retaliation.

The Court further erred in disregarding Defendant's spoliation of evidence. Earlier in the case, when its spoliation was not at issue, Defendant relied on Plaintiff's attendance as a purported legitimate basis for her termination. Once its spoliation was evident, Defendant strategically retreated from Plaintiff's attendance as a basis for terminating her. The Court erred in permitting Defendant to treat its bases for terminating Plaintiff as movable chess pieces. Defendant's attempt to do so alone should have been presented to a jury for consideration of pretext.

The Court committed another manifest error of law in determining that a set of Written Office Guidelines prepared specifically for Plaintiff was not sufficiently adverse to qualify as retaliation. Finally, the Court committed a manifest error of fact in determining that Plaintiff has not sufficiently challenged Defendant's allegation that Plaintiff was rude to an Information Technology ("IT") representative, a fact the Court relied on as a purported intervening act of insubordination broke the chain between Plaintiff's protected activity and Defendant's termination of her employment.

The Court should withdraw its prior Order, deny summary judgment as to Counts I-IV and re-set this matter for trial.

## II. The Court's Order

On April 13, the Court issued an Order entering summary judgment for Defendants on all counts. [D.E. 134]. Shortly thereafter, the Court issued a separate Order denying all other pending Motions as moot. [D.E. 135]. Plaintiff moves for reconsideration of the Court's ruling as to Counts I-IV for disability/handicap discrimination under the Americans with Disabilities

Act ("ADA") and Florida Civil Rights Act ("FCRA") and for retaliation under the ADA and FCRA.

A. **Facts Assumed on Summary Judgment**

In ruling on summary judgment, the Court assumed the following facts, some of which were disputed:

- On October 10, 2013, Plaintiff's direct supervisor Jonathan Leeds berated her about her mental health condition, including comments suggesting that she needed to have her medications changed or increased; [D.E. 134 at 13]

- On October 11, 2013, Plaintiff engaged in protected activity when she reported Leeds' comments and other incidents to Human Resources ("HR"); (*Id.* at 15)

- Leeds learned that Plaintiff had reported him to HR at approximately noon on October 11, 2013; (*Id.* at 49-50)

- Within minutes of learning that he had been reported to HR, Leeds asked HR to shut down Plaintiff's remote access to Defendant's server as part of a request to terminate her; (*Id.* at 16)

- Also within minutes of learning that he had been reported to HR, Leeds separately contacted his direct supervisor, Senior Vice President Macon Albertson and, without advising that an HR investigation was underway, sought Albertson's permission to terminate Plaintiff; (*Id.* at 18)

- Within hours of learning that he had been reported to HR, during his interview with HR representative Tina Freitas, Leeds characterized Plaintiff as "disturbed" and as having "major mental issues." During the interview, for the third time in just hours, Leeds asked that Plaintiff be terminated; (*Id.* at 17)

- After doing nothing more than field Plaintiff's telephonic complaint and Leeds' telephonic denial, Freitas concluded that she could not determine whether Leeds made the offensive remarks to Plaintiff about her mental health disability. Leeds was not reprimanded in any manner; (*Id.* at 18)

- Upon her return to the office on October 16, 2013, Plaintiff, **the one who complained about disability discrimination five days earlier**, was handed a written warning titled "Office Guidelines for Vanessa Militano." The guidelines were prepared jointly by

Leeds and Freitas, and included eight mandates on issues upon which Plaintiff had never been counseled in writing in three years; (*Id.* at 19-20) (emphasis added)[1]

- From October 16 through October 25, the date on which the termination decision was made, Leeds sent multiple e-mails to Albertson and Freitas documenting perceived deviations from the written guidelines. The e-mails contained comments from Leeds such as "Won't tolerate this anymore, guys," "I've already spent too much time on this," and "she should have been out of here this morning;" (*Id.* at 22)

- The decision to terminate Plaintiff was made on October 25, the same date Leeds sent an e-mail to Albertson and Freitas saying that Militano "should have been out of here this morning;" (*Id.* at 27)

- Among the incidents allegedly supporting termination was a conversation between Plaintiff and an Information Technology ("IT") representative Rhonda Reid. Defendant alleges that, in the course of seeking Reid's assistance to change her work password, Plaintiff was insubordinate to Reid. Plaintiff denies this. Freitas was not a witness to the conversation. However, notably, in contrast to her inability to resolve the October 10 "he said/she said" between Plaintiff and Leeds, Freitas had no problem concluding that Reid was being truthful and that Plaintiff was lying. (*Id.* at 23-24).

**B.    The Court's Mistakes of Fact**

The record contains reams of discriminatory and retaliatory evidence by which a jury easily could conclude that Plaintiff's termination was unlawful. However, the Court discounted the evidence based on its mistaken conclusion that Jonathan Leeds was not part of the decision to terminate Plaintiff. (*Id.* at 39).

In its summary judgment Motion and supporting Reply, Defendant did not argue that Leeds was uninvolved in the termination decision. [D.E. 47, 91]. Rightfully so, since the uncontroverted evidence shows otherwise.

1.    <u>Leeds directly participated in the decision.</u>

In its Answers to Plaintiff's First Set of Interrogatories, which in fact were verified by Leeds himself, Defendant answered Interrogatory #3 as follows:

---

[1] The Court omits the material fact that at the time she engaged in protected activity, Plaintiff did not have a single demerit documented in her personnel file or anywhere else in three years working for Defendant and its predecessor in interest. (Freitas Dep. at 89-90) (Exhibit A).

> *Interrogatory No. 3*: Identify all Randstad agents and employees **who participated in the decision to terminate Plaintiff.**
>
> *Answer:* I. Tina Freitas; II. **Jonathan Leeds**; III. Macon Albertson; and IV. Sonya Hinds.

(Exhibit B) (Emphasis added).

By Defendant's sworn admission, Leeds participated in the **decision** to terminate Plaintiff. Not just in administering the termination or the events leading up to the termination but in the **decision to terminate**. Defendant's sworn Interrogatory responses were not among the documents before the Court because Defendant did not put Leeds' role in the termination decision in controversy. Given the quantum of discriminatory and retaliation evidence against Leeds, if distancing him from the termination decision was a viable choice, Defendant would have placed it front and center.

2. Documents.

The documents fully support Defendant's sworn response, as the record is replete with correspondences among Leeds, Freitas and Albertson between Militano's first day back at the office on October 16, 2013 and October 25, 2013, the date the decision to terminate was made. (Comp. Exh. C). The subject of the communications is entirely about Militano, her alleged failure to adhere to the retaliatory guidelines placed upon her, the need to document, and whether to terminate her. (*Id.*). The timeline of relevant e-mails is below:

| DATE/TIME | SENDER | RECIPIENT(S) | SUBSTANCE |
|---|---|---|---|
| 10/16/2013 5:43 p.m. | Leeds | Freitas Albertson | "First day Vanessa arrived on time 9:50 a.m. but left at 4:45 p.m. Very first day back." |
| 10/18/2013 2:30 p.m. | Freitas | Leeds Albertson | "Let's monitor and if this continues next week you should sit her down or send an email with the following:" [Template reprimand] |
| 10/23/2013 1:09 p.m. | Leeds | Freitas Albertson | [Forwarding exchange between he and Plaintiff . . .] **"Won't tolerate this – I am sorry guys – this is too much for me."** (Emphasis added) |
| 10/23/2013 1:19 p.m. | Albertson | Leeds Freitas | "Will call you after a bit. **I don't know what to do, but having a person disrupt [t]he whole works is a little nutty.**" (Emphasis added) |

| 10/23/2013 1:33 p.m. | Freitas | Leeds Albertson | "I just got off the phone with her. **Jon do you have time to talk later?**" (Emphasis added) |
| 10/23/2013 1:35 p.m. | Leeds | Freitas Albertson | "anytime – I am spending too much time on this so please . . ." |
| 10/25/2013 3:09 p.m. | Leeds | Freitas Albertson | [Forwarding exchange between he and Plaintiff . . .] "I really want to respond but I am seriously biting my tongue – I am not going to respond verbally in writing even though I feel I should. Honestly you guys are not putting me [in] a very bad situation here. **She should have been out of here this morning.**" (Emphasis added) |

The date of Leeds' final e-mail just so happens to be the date on which the termination decision occurred. The Court's interpretation of this chain of events – that Leeds' multiple pleas for Plaintiff's termination were rejected, but that HR independently decided to fire her – simply is unsupported by the record, which is bolstered by Defendant's sworn admission that Leeds and Albertson participated in the decision to terminate Plaintiff. From the time of Plaintiff's engaging in protected activity on October 11 to her ultimate demise on October 25, a steady process of tripartite communications occurred among Leeds, Freitas and Albertson whereby Leeds pushed constantly for Plaintiff's termination until HR was satisfied that enough documentation was present to grant his request.

    3.    <u>Whether Plaintiff was rude to Defendant's IT representative Rhonda Reid is a disputed issue of fact.</u>

The Court concluded as a matter of undisputed fact that Plaintiff was rude to Defendant's IT representative Rhonda Reid during an October 24, 2013, conversation. [D.E. 134 at 23]. Though Plaintiff contested this fact on summary judgment, the Court concluded that Plaintiff's opposition was insufficient because the document she cited in support, Reid's e-mail to Tina Freitas, was silent as to Plaintiff's demeanor. [*Id.*]. However, Plaintiff was asked about the incident in her deposition, which also is on file with the Court:

Q. Do you recall becoming confrontational with her?

A. **No. Absolutely not.**

Q. If she said that you yelled at her would you disagree with that?

A. Why would I yell at her?

Q. I'm asking –

Mr. Salner: Just answer the question.

A. **I'm sorry. No, I did not yell at her.**

Q. If other people in the office heard you have a conversation with Ms. Reid and you were confrontational with her, would you disagree with that as well?

A. **Yes.**

(Militano Dep. at 278-279) (emphasis added) (Exh. D).

The tenor of Plaintiff's discussion with IT is a disputed issue of material fact. The Court erred in concluding otherwise.

### C. The Court's Mistakes of Law

1. <u>Defendant retreated from a purported basis for terminating Plaintiff without consequence.</u>

Throughout this lawsuit, Defendant has alleged that one of its legitimate, non-discriminatory reasons for terminating Plaintiff's employment was her attendance. (*See* Comp. Exh. E). Indeed, Defendant produced Plaintiff's 2013 Attendance Record in discovery in response to a request for production seeking all documents relating to Plaintiff's **termination**. (*Id.*). Then in its Reply supporting summary judgment, in the face of spoliation allegations relating to the attendance records of Plaintiff's co-workers, Defendant retreated from its stated reason, arguing now that Militano's attendance was not a reason for its decision to terminate her employment. [D.E. 91 at 6]. The Court noted Defendant's abandonment of its asserted non-discriminatory reason for terminating Militano's employment but stopped there. [D.E. 134 at 40,

n. 27]. As discussed more fully below, the Court erred in failing to consider Defendant's abandonment of its stated reason for terminating Militano's employment as evidence of pretext.

2. <u>The written "Office Guidelines for Vanessa Militano" was an adverse action.</u>

On her first day back to the office after engaging in protected activity, Plaintiff was handed a set of written "Office Guidelines for Vanessa Militano." (*Id.* at 19-20). The Guidelines, which were the idea of Leeds, the subject of Plaintiff's complaint, contained eight criteria on which Plaintiff had never once been reprimanded in writing in three years of employment. (*See* Exh. A). Leeds admitted that he never had prepared a similar set of guidelines for any other subordinate. (Leeds Dep. at 179).[2] Leeds relied on the guidelines in reporting Plaintiff for allegedly leaving work early when in fact she had left the office for a client meeting, a fact Leeds failed to vet before reporting Plaintiff to Freitas and Albertson. (*See* Exh. C).

The Court held that the issuing of guidelines was not an adverse employment action sufficient to support a retaliation claim, citing Eleventh Circuit law for the proposition that the act must be "material and significant and not trivial" and one that might dissuade a reasonable worker from making or supporting a charge of discrimination. [D.E. 134 at 46]. The Court committed manifest error in concluding either that a written warning jointly prepared by Plaintiff's boss and HR was "trivial" or that no reasonable factfinder could determine that receiving such a warning could dissuade a reasonable worker from making a claim of discrimination.

---

[2] All cited excerpts to Leeds' deposition are attached as Comp. Exh. F.

## III. Discussion

### A. Legal Standard

A Rule 59(e) motion for reconsideration of an order may only be granted on the grounds of newly discovered evidence or manifest errors of law or fact. *Arthur v. King*, 500 F. 3d 1335, 1343 (11th Cir. 2007); *Porto Venezia Ass'n, Inc. v. WB Ft. Lauderdale, LLC*, 926 F. Supp. 2d 1330, 1332 (S.D. Fla. 2013). For a court to reconsider its prior judgment the moving party must present facts or law of a strongly convincing nature that would induce a court to reverse its prior decision. *Porto Venezia*, 926 F. Supp. 2d at 1332; *Burger King Corp. v. Ashland Equities, Inc.*, 181 F. Supp. 2d 1366, 1370 (S.D. Fla. 2002).

### B. The Court Committed a Manifest Error of Fact in Concluding that Leeds Had No Role in the Decision to Terminate Plaintiff.

The Court acknowledged a significant volume of circumstantial evidence of Jonathan Leeds' discriminatory and retaliatory animus against Plaintiff. His belittling remarks about her medication, his undisputed comments to HR about her being "disturbed" and having "major mental issues," his immediate attempts to have Plaintiff fired after learning he had been reported to HR, and his continued attempts to have her fired in the days that followed, including falsely reporting her as violating her "Office Guidelines." The evidence, most of which is undisputed, easily could persuade a jury that Plaintiff's termination was discriminatory and retaliatory, and that Defendant's purported legitimate bases for terminating her were pretextual. In granting summary judgment, the Court did not consider the substantial evidence tying Leeds to discrimination and retaliation. The Court instead excluded Leeds from consideration on the incorrect premise that Leeds was not part of the decision to terminate Plaintiff, either directly or on a "cat's paw" theory.

The Court's factual conclusion is contradicted by Defendant's sworn admission that Leeds indeed was part of the **decision** to terminate Plaintiff. While the quantum of e-mails between Leeds, Albertson and Freitas at minimum raises a fact question regarding Leeds' role in the decision, the Interrogatory response removes any doubt.

The Court's mistake of fact converted the case from a compelling claim involving a decision maker with significant evidence of animus to a potentially non-viable claim regarding whether an HR representative in Massachusetts discriminated or retaliated against Plaintiff. The mistake is the type of manifest error for which Rule 59(e) was written. *See Light for Life, Inc. v. Our Firm Foundation for Koreans, Inc.*, 2012 WL 5398441, *1 (M.D. Ga. Nov. 2, 2012) (granting Motion for Reconsideration where District Court mistakenly found that certain defendants had not joined motion to dismiss); *Blackwell v. Stryker Howmedica Osteonics Corp.*, 2010 WL 5139256, *1 (S.D. Ala. Dec. 13, 2010) (granting motion for reconsideration on motion to dismiss where District Court mistook contents of the Amended Complaint); *U.S. v. Klohn*, 2010 WL 1379961, *2 (M.D. Fla. Mar. 31, 2010) (granting motion for reconsideration and vacating judgment after District Court misapprehended Defendant's affirmative defenses).

The error was "manifest" because the Court relied on its error of fact to thwart Plaintiff at every point of her burdens under the *McDonnell-Douglas* framework. The Court first held that Plaintiff could not state a *prima facie* case of disability discrimination. [D.E. 134 at 39]. The Court, however, continued to apply the *McDonnell-Douglas* test assuming, *arguendo*, that Plaintiff could state a *prima facie* case. [*Id.* at 39]. When it came to pretext, the Court again rejected Plaintiff's arguments about the extensive circumstantial evidence of Leeds' animus because Freitas alone purportedly was the decisionmaker. [*Id.* at 41]. The Court's error permeates its decision as to disability discrimination.

The Court's error had a similarly manifest impact on its summary judgment ruling on retaliation. While the Court conceded that Plaintiff could state a *prima facie* case, the Court eventually rejected Plaintiff's pretext arguments based in substantial part on its false finding that Leeds was not part of the decision to terminate Plaintiff. [*Id.* at 55]. Once the Court's error is corrected, a reasonable factfinder easily could conclude that the contrast between Leeds' treatment of Plaintiff before and after she engaged in protected activity, including his five to six attempts to fire her until he finally received agreement from HR and his supervisor, is evidence that Defendant's purported bases for termination were pretextual.

### C. The Court Committed a Manifest Error of Law in Failing to Consider Defendant's Shifting Reasons for Plaintiff's Termination.

Defendant's assertion in its Reply that it did not terminate Militano's employment because of her attendance is inconsistent with its assertion throughout this lawsuit that it did terminate Militano's employment in part because of her attendance. The Court noted Defendant's tactic but erred in failing to assign it any significance. "Pretext may also be established by proof of inconsistent statements or shifting explanations for the adverse employment decision, suggesting that the articulated reasons are recently fabricated or false." *Walker v. St. Joseph's/Candler Health Sys., Inc.*, 506 Fed. Appx. 886, 889 (11th Cir. 2013). *See Bechtel Constr. Co. v. Sec'y of Labor,* 50 F.3d 926, 935 (11th Cir.1995) ("The pretextual nature of Bechtel's terminating Nichols is further demonstrated by Bechtel's shifting explanations for its actions"). Defendant's abandonment of its stated reason is evidence from which a jury could find pretext. *See Howard v. BP Oil Co., Inc.*, 32 F.3d 520, 526 (11th Cir. 1994). The court erred in not considering this evidence in its analysis. *Cicero v. Borg-Warner Auto., Inc.*, 280 F.3d 579, 592 (6th Cir. 2002) ("Court [should] question a defendant's proffered justification when it shifts over time. When the justification for an adverse employment action changes during litigation,

that inconsistency raises an issue whether the proffered reason truly motivated the defendants' decision").

The Court's error harmed Plaintiff twice in this instance because not only is pretext proven by Defendant's tactics alone, but as argued in Plaintiff's summary judgment briefing, Defendant's spoliation of evidence on the attendance issue should have precluded summary judgment. Where, as here, a defendant's spoliation of evidence may have prejudiced a plaintiff's ability to demonstrate pretext, the sanction of denying the defendant's motion for summary judgment is warranted. *Brown v. Chertoff*, 563 F. Supp. 2d 1372, 1381 (S.D. Ga. 2008) (denying employer's motion for summary judgment based on employer's spoliation of evidence relevant to pretext); *Watson v. Edelen*, 2015 WL 58808, *3 (N.D. Fla. Jan. 5, 2015)("At the summary judgment stage, the spoliation doctrine provides a basis for denying a motion for summary judgment where there is sufficient probative evidence for a jury to find an act of spoliation and to draw the inference derived from such an act").

The jury should have been permitted to consider Defendant's spoliation of evidence as well as Defendant's tactic of maneuvering among purported legitimate bases for terminating Plaintiff.

> **D. The Court Committed a Manifest Error of Fact in Concluding that the Uncontroverted Evidence was that Plaintiff was belligerent with IT Representative Rhonda Reid.**

As discussed above, the Court concluded that as a matter of undisputed fact, Plaintiff was belligerent with Defendant's IT representative Rhonda Reid on or about October 24, 2013. While Reid's 7-paragraph e-mail to Freitas in which she says nothing about any belligerent behavior is sufficient to contradict a self-serving Affidavit signed 18 months later, Plaintiff

denied in deposition that she was confrontational with Reid in any manner. Plaintiff's deposition testimony was on file with the Court at the summary judgment stage. [D.E. 32].

The error was manifest because the Court held that the alleged incident with Reid broke the causal link between Plaintiff's protected activity and the adverse employment actions against her. [D.E. 134 at 51]. However, since it is materially disputed that Plaintiff was confrontational with Reid, the Court on summary judgment must accept Plaintiff's version of the event and cannot find that the incident broke the link between Plaintiff's complaint and her termination. The Reid incident and every other claim against the Plaintiff between October 16 and October 25 is disputed. Plaintiff disputes arriving to work late. She disputes leaving work early. She disputes being insubordinate to Reid. She disputes being insubordinate to Freitas. She disputes leaving a Hot Jobs meeting early or cursing at her boss. These are fact issues that should have been presented to a jury, and the Court committed manifest error in finding on summary judgment that the causal link between her protected activity and her termination was broken by disputed allegations.

E. **The Court Committed a Manifest Error of Law in Concluding that the Written "Office Guidelines for Vanessa Militano" Was Not an Adverse Employment Action.**

On her first day back after complaining to HR about Leeds, Plaintiff was handed a set of written "Office Guidelines for Vanessa Militano." The guidelines were Leeds' idea and jointly prepared by he and Freitas. (Freitas Dep. at 76). The guidelines contained eight criteria, none of which she had ever been written up for. (*Id.* at 79-88). From the day she was presented with them, Leeds began reporting perceived infractions to Freitas and Albertson. (*See* Exhibit C).

Citing three cases, the Court held that issuance of the guidelines was not an adverse action severe enough to trigger a retaliation claim. The Court cites *Tarmas v. Sec'y v. Navy*, 433

F. App'x 754 (11th Cir. 2011), first for the general rule regarding the requisite severity of an adverse action for purposes of retaliation. [D.E. 134 at 46-47]. An adverse action must be material and significant and not trivial. (*Id.*). A materially adverse action is one that well might have dissuaded a reasonable worker from making or supporting a charge of discrimination. (*Id.*).

The Court later adds a parenthetical purportedly analogizing *Tarmas* to this case because the court in *Tarmas* held that under the circumstances of the case, "there was nothing retaliatory about a supervisor notifying an employee of problems with his work." *Tarmas*, 433 F. App'x at 763. However, *Tarmas* is distinguishable because the supervisor was not aware of the protected activity at the time of the written reprimand. *Id.* Leeds was of course aware that a complaint was made against him at the time he had the idea to issue Plaintiff written guidelines. *Tarmas* is further distinguishable because the plaintiff filed his lawsuit while currently employed with the defendant. *Id.* The *Tarmas* court relied on that fact to find that the adverse action was not material because it did not dissuade Tarmas from engaging in further protected activity – suing his employer. *Id.*[3] Again, in this case Plaintiff did not engage in further protected activity until she was terminated. Aside from providing the general rule of law on materially adverse actions for purposes of retaliation, *Tarmas* has no application here.

The Court further relies on *Swindle v. Jefferson County Com'n*, 593 Fed. Appx. 919, 927 (11th Cir. 2014) for the proposition that "petty slights, minor annoyances, and simple lack of good manners are not likely to deter a victim of discrimination from complaining to the EEOC and thus do not constitute retaliation." Plaintiff has no issue with this point of law, but takes exception to analogizing a written reprimand administered jointly by her supervisor and HR as a "petty slight, minor annoyance, or lack of good manners." The guidelines were a tangible

---

[3] The initial protected activity in *Tarmas* which led to alleged retaliation was the employee's administrative charge of discrimination. (*Id.*). The employee filed his charge, was allegedly retaliated against, and then filed his lawsuit while still employed. (*Id.*).

written warning, and alleged violation of the guidelines served as part of the purported basis for her termination. [D.E. 48 at 8].

The Court also relies on *Lucas v. W.W. Grainger, Inc.*, 257 F. 3d 1249, 1261 (11th Cir. 2001) for the proposition that a negative performance evaluation, standing alone, does not constitute an adverse employment action sufficient to state a *prima facie* case of retaliation under the ADA. [D.E. 134 at 47]. The *Lucas* court held that an employment action is considered "adverse" only if it results in some tangible, negative effect on the plaintiff's employment. *Lucas*, 257 F. 3d at 1261. *Lucas* is inapposite because it pre-dates *Burlington Northern & Santa Fe Ry. Co. v. White*, 126 S. Ct. 2405, 2414-2415 (2006), where the Supreme Court distinguished the claimant's burden in discrimination and retaliation claims. The standard discussed in *Tarmas* above derives from *Burlington Northern*. Since the *Burlington Northern* decision, the "tangible, negative effect" threshold discussed in *Lucas* is bad law.

After *Burlington*, the scope of potentially adverse actions not only is broadened but, more importantly, is a fact-specific inquiry in which individual circumstances govern. *See Blanc v. City of Miami Beach*, 965 F. Supp. 2d 1350, 1355 (S.D. Fla. 2012) ("As the Court in *Burlington* noted, 'context matters ... [For example,] [a] schedule change in an employee's work schedule may make little difference to many workers, but may matter enormously to a young mother with school age children'").

Based on Plaintiff's individual circumstances, a reasonable factfinder easily could have concluded that issuance of the written guidelines was materially adverse in that it would have dissuaded an employee from engaging in further protected activity. The Court should first recall that prior to Plaintiff's engaging in protected activity, not a scintilla of evidence suggests that the guidelines ever would have been prepared. After Plaintiff's approximately 2:00 p.m. discussion

with Leeds on October 10, 2014, before she engaged in protected activity the next day, Leeds took no further action that day or the next morning. He did not call Albertson to ask to fire Plaintiff. He did not call HR to try and fire Plaintiff or ask for assistance to prepare "Office Guidelines." He did not personally write up Plaintiff. If Plaintiff did not complain to HR, the "Office Guidelines" never would have existed.

In terms of the protected activity, Plaintiff's complaint was squarely rejected. HR determined that it could not hold Leeds responsible for any negative comments from October 10th. Leeds was not reprimanded in the slightest, not even sent to sensitivity training in an abundance of caution. Plaintiff's parallel claim of a hostile work environment also was rejected. Instead, by Defendant's admission, Plaintiff became the target of her own complaint, ultimately leading to the issuance of the guidelines. (Leeds Dep. at 168-169). In **this** context, the context *Burlington Northern* requires the factfinder to examine, what reasonable employee would make another complaint about disability discrimination after what Plaintiff endured following her complaint? No one would. Yet, the Court took this matter out of the jury's hands, finding as a matter of law that issuance of the guidelines was not materially adverse. In so doing, the Court committed a manifest error of law.

### IV. Conclusion

Based on the foregoing, Militano respectfully requests an Order granting her Motion for Reconsideration, vacating summary judgment for Defendant as to Counts I-IV, and re-setting this matter for trial.

CASE NO. 14-cv-21285-O'SULLIVAN

## CERTIFICATE OF SERVICE

WE HEREBY CERTIFY that a true and correct copy of the foregoing was served via cm/ecf procedures on this 8th day of May, 2015, to the following:

Arlene K. Kline, Esq.
AKERMAN LLP
777 South Flagler Drive
Suite 1100 West Tower
West Palm Beach, FL, 33401
arlene.kline@akerman.com

Shayla N. Waldon, Esq.
AKERMAN LLP
777 South Flagler Drive
Suite 1100 West Tower
West Palm Beach, FL, 33401
shayla.waldon@akerman.com

CLARKE SILVERGLATE, P.A.
*Counsel for Plaintiff, Vanessa Militano*
799 Brickell Plaza, Suite 900
Miami, Florida 33131
Telephone:    (305) 377-0700
Facsimile:    (305) 377-7001

By: _____
Spencer Silverglate
Florida Bar No. 769223
Francisco Ramos, Jr.
Florida Bar No. 114766
Craig Salner
Florida Bar No. 669695